No. 58,690

STATE OF KANSAS, *Appellee,* v. LESLIE NORMAN WALKER, *Appellant.*

(722 P.2d 556)

Opinion filed July 18, 1986.

*Steven A. Ediger,* of Juhnke, Howell & Ediger, of Hutchinson, argued the cause and was on the brief for appellant.

*David E. Roberts,* assistant county attorney, argued the cause, and *Robert T.*

*Stephan,* attorney general, and *Timothy J. Chambers,* county attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: Appellant, Leslie N. Walker, appeals his jury convictions of first-degree murder (K.S.A. 21-3401), aggravated kidnapping (K.S.A. 21-3421), aggravated robbery (K.S.A. 21-3427), and conspiracy (K.S.A. 21-3302). The relevant facts are as follows:

On January 19, 1985, George Taubert phoned Reno County Attorney Tim Chambers and told him he had something "pretty heavy" to tell him. Taubert told Chambers this information related to "a killing" but would not tell him any more over the phone. Chambers contacted Floyd Bradley, Reno County Special Agent for the K.B.I., and the two men drove to Taubert's residence located just outside the city of Hutchinson. When they arrived, Taubert refused to give them any information unless they agreed to grant him complete immunity for what he was about to tell them and to recommend probation on an unrelated theft conviction for which he had not yet been sentenced. Chambers agreed to Taubert's requests (with some conditions), whereupon Taubert related the following story.

On August 3, 1984, Leslie Walker picked up George Taubert and the two of them drove from Hutchinson to the El Dorado-Augusta area. On the way back to Hutchinson, Walker told Taubert about a man named Eugene "Bud" Branton, Jr., who worked with Walker at the FarMarCo Elevator in Hutchinson. He told Taubert Branton always carried large sums of money in his wallet and that he had a plan to rob and murder Branton.

Before the two men returned to Hutchinson, they stopped in a secluded area in the country nearby. There, they target practiced with two twelve gauge sawed-off shotguns. The spent shell casings and empty shotgun shell boxes were left at the location.

Three days later Walker unexpectedly reappeared at Taubert's residence. He told Taubert he had just had a beer with Branton and had seen the contents of Branton's wallet, which convinced Walker that Branton had just cashed his paycheck. Thereupon, Walker and Taubert put their shotguns in the back of Walker's red Mazda pickup and drove to Branton's home.

Upon arriving at Branton's residence, the men lured Branton away by telling him Taubert had a horse for sale which was

located in western Reno County. The three men rode in Walker's pickup to a secluded and isolated country road in western Reno County, where Walker parked the pickup and told Branton they were going to stop and do some target shooting. All three men got out of the pickup. Taubert then shot at Branton, tripping as he did so. Taubert did not actually see this first shot strike Branton. As Taubert tried to get back up, Walker shot Branton in the buttocks. Taubert then observed Branton crawling toward the truck with his hands outstretched. Before Branton reached the pickup, both Walker and Taubert fired two shots each into Branton's head.

Walker then removed a wallet from Branton's hip pocket and, with Taubert's help, dragged Branton's body to a ditch covered with tall grass and bushes. At Walker's suggestion, Taubert helped pick up the shotgun shells which had been fired. Walker threw the shells out the window on the way back to Hutchinson. They then returned to Branton's home to remove any items which might contain their fingerprints—e.g., an ash tray and some rifles.

About a week after the murder of Bud Branton, Walker told Taubert he had returned to the murder scene and moved Branton's body to a second location and covered it with rocks. Walker also stated he had disposed of the shotgun he used in Branton's murder. He did not tell Taubert the new location of either the body or the shotgun.

Shortly thereafter, Branton was reported missing. Walker had been questioned by the Reno County Sheriff's Department in that connection but the investigation was at a standstill until Taubert contacted Chambers on January 19, 1985.

After giving a brief statement about the murder, Taubert was taken to the Reno County Law Enforcement Center where a radio transmitter, commonly referred to as a "wire" or "body pack," was taped to his chest and concealed under his clothing. Once the body pack was tested and found to be operating properly, Taubert drove to Walker's residence, in his own car, followed by sheriff's detective Mike Lucia and KBI agent Bradley in a separate unmarked automobile. There, Walker and Taubert discussed hiding Branton's body and Walker's gun. This conversation was tape-recorded and the original tape recording was introduced at Walker's trial as State's exhibit No. 38 to corroborate Taubert's story of the murder of Bud Branton.

After a one week jury trial, appellant was convicted of first-degree murder, aggravated kidnapping, aggravated robbery, and conspiracy. He was sentenced to life imprisonment for first-degree murder, life imprisonment for aggravated kidnapping, forty-five years to life for aggravated robbery, and fifteen to sixty years for conspiracy, with the sentences to run consecutively.

Appellant's primary argument on appeal is that he was denied effective assistance of counsel. We recently ruled in *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986), that in an appeal from conviction of a crime, the allegation that a defendant did not have effective assistance of counsel will not be considered for the first time on appeal. We further held that when appellate counsel in a criminal case desires to raise the issue of ineffective assistance of counsel on direct appeal, and that issue has never been ruled upon by the trial court, the defendant may seek a remand of the case to the trial court for an initial determination of the issue. 239 Kan. at 120.

Walker contends the issue of ineffective assistance of counsel was raised and ruled upon at the trial court level and therefore can be considered on appeal. Appellant bases this argument upon the fact that he filed a pro se motion to dismiss his court-appointed attorney for inadequate representation. The trial court permitted appointed counsel to continue without making a formal ruling on the motion. Appellant also filed a petition for a Writ of Habeas Corpus with the trial court alleging, among other things, inadequate representation. This petition was denied by the trial court. We conclude the issue of ineffective assistance of counsel was properly presented to the trial court and effectively denied. Thus, the issue is properly before us on direct appeal.

Let us now consider appellant's claims of ineffective assistance of counsel, and the standards to be applied. In *Chamberlain v. State,* 236 Kan. 650, 656-57, 694 P.2d 468 (1985), we adopted the following standards to be used in evaluating the effectiveness of counsel under the Sixth Amendment:

"*First:* The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

"*Second:* A convicted defendant's claim that counsel's assistance was so

defective as to require reversal of a conviction or setting aside of a death sentence requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

"(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

"(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."

These standards were derived from *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In *Strickland,* the court set forth a two-pronged approach to evaluating ineffective assistance of counsel claims. In order to obtain a reversal of a conviction, the defendant must first show counsel's representations fell below an objective standard of reasonableness. 466 U.S. at 688. Second, the defendant must establish a reasonable probability the decision challenged would have been different had he received effective assistance. 466 U.S. at 694.

Appellant first claims the failure of defense counsel to challenge the admission of the "body pack" tape recording on the basis of improper foundation constituted ineffective assistance of counsel. Defense counsel made a pretrial motion to suppress the tape recording, arguing the tape lacked relevance and that the defendant was not advised of his *Miranda* rights. The trial court denied this motion. When the tape was introduced at trial, defense counsel did not object on the grounds of improper foundation and the tape was played to the jury. Appellant contends this failure to object was highly prejudicial to his case and resulted in his being denied a fair trial.

The foundation requirements for admission of a tape recording were set forth in *State v. Williams,* 235 Kan. 485, 491, 681 P.2d 660 (1984):

" 'The cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording, and indicate a reasonably strict adherence to the rules prescribed for testing the admissibility of recordings, which have been outlined as follows: (1) a showing that the recording device was capable of taking testimony; (2) a showing that the operator of the device was competent; (3) establishment of the authenticity and correctness of the recording; (4) a showing that changes, additions, or deletions have not been made; (5) a showing of the manner of the preservation of the recording; (6) identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement.' 29 Am. Jur. 2d, Evidence § 436, pp. 494-95."

Prior to the admission of the tape-recorded conversation between Taubert and Walker, the State presented the testimony of Floyd Bradley, the KBI Special Agent. Agent Bradley testified that on January 19, 1985, he placed a "body pack" on George Taubert. He described the "body pack" as a radio transmitter composed of a microphone, wire antennae, and battery power pack, which is designed to pick up sounds and transmit those sounds in the form of radio waves. Agent Bradley also described the radio receiver, the second component of the system used to record Taubert's conversation with Walker. The receiver is a self-contained unit which simultaneously records transmissions received from the body pack and rebroadcasts those transmissions in their original form.

Bradley testified that after he placed the "body pack" on Taubert, Taubert proceeded in his own vehicle to Leslie Walker's home. The purpose of the trip was to obtain a statement from Walker to confirm Taubert's statement to Chambers and Bradley. KBI agent Bradley and Detective Lucia followed Taubert in a separate vehicle in which the radio receiver and tape recorder were assembled.

Bradley and Lucia kept Taubert in sight all the way to Walker's home. They stopped two or three blocks away in a position where they could see the front of the Walker house. It was approximately 8:00 to 8:30 p.m. in the middle of winter. When Taubert arrived at Walker's house he proceeded from his car to the front porch. The light came on and Taubert briefly went in the house; then both Taubert and Walker came out on the front porch. The transmitter was on the entire time. While they were in the house, Bradley and Lucia could hear the Walker television broadcasting. When the two men came to the front porch the substance of their conversation was transmitted to Bradley and Lucia and the tape recorder preserved the conversation.

Bradley operated the tape recorder. He acknowledged he was not an expert in this area but had experience making such tapes. Bradley testified that after the two men finished their conversation, he then removed the tape from the recorder, initialed it, and turned the original over to Detective Griffin for safekeeping. Griffin had two copies made and kept all three tapes awaiting trial. At trial, Bradley identified his initials on the master tape, which was introduced into evidence as Exhibit 38. There was no break in the chain of evidence. The court admitted the tape into evidence without objection save for a previous question of relevancy which was resolved against the defendant before trial.

The question is whether the foundation laid for the admission of the tape is sufficient to withstand Walker's claim that failure to object constitutes inadequate representation of counsel. Our review of the record convinces us the foundation laid meets the requirements of *State v. Williams,* 235 Kan. 485.

Appellant's next allegation of ineffective assistance of counsel is based upon the failure of the defense counsel to file motions to suppress items not listed in the search warrant. The search warrant describes the items to be seized as a "1975 Mazda pickup bearing RN 29086, blood and pellet holes clothing with blood therein." This description is confusing but is clarified somewhat by the affidavit in support of the warrant. The affidavit contains a request for a search warrant to "search and seize from the residence of Leslie Walker . . . a 1975 red Mazda pickup bearing RN 29086 for blood and pellet holes and the residence of Leslie Walker to seize clothing with blood thereon . . ." The scope of the warrant was therefore limited to the pickup and clothing found in the residence.

However, upon searching the home, Detective Griffin of the Reno County Sheriff's Department seized a ring found in a boot in appellant's closet and shotgun shells found in the crawl space of appellant's basement. No motion to suppress these items was ever made by defense counsel and the items were introduced into evidence without objection.

The Fourth Amendment states "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Therefore, absent a well-delineated

exception, the seizure of items not particularly described in a search warrant is unconstitutional.

Appellant argues none of the exceptions to the Fourth Amendment are applicable here and, therefore, counsel should have filed a motion to suppress. The State argues the "plain view" exception to the Fourth Amendment is applicable.

In *State v. Galloway*, 232 Kan. 87, 91, 652 P.2d 673 (1982), we set out three basic requirements which must be met before the plain view exception to the Fourth Amendment is applicable:

"(1) The initial intrusion which afforded authorities the plain view must be lawful; (2) the discovery of the evidence must be inadvertent; (3) the 'incriminating character' of the article must be 'immediately apparent' to searching authorities."

See *State v. Parker*, 236 Kan. 353, 358, 690 P.2d 1353 (1984).

In the instant case, the initial intrusion of the appellant's residence was lawful by virtue of a valid search warrant and the discovery of the ring and shotgun shells while searching for bloody clothing was inadvertent. Thus, the first two requirements of the test set forth in *Galloway* are satisfied. Application of the third requirement involves a little more analysis.

In order to meet the third factor, the "incriminating character" of the ring and shotgun shells must have been "immediately apparent" to the searching officers. For an object to be incriminating for constitutional purposes, the seizing authority need only have reasonable or probable cause to believe the object is evidence of a crime. *State v. Galloway*, 232 Kan. 87, Syl. ¶ 3.

It is clear that the police had probable cause to believe the shotgun shells were evidence of a crime since Taubert had already told them that Walker had utilized a shotgun in the murder of Bud Branton. Thus, the discovery of the shotgun shells came within the plain view exception to the Fourth Amendment. Accordingly, there is no support for appellant's contention that defense counsel should have filed a motion to suppress the shotgun shells.

The ring presents a different story. It was introduced to connect Walker to the shotgun used by Taubert in the murder of Bud Branton. Mr. Shurley Burnett testified at trial his home was robbed in July of 1984 and that among the items taken were his twelve gauge shotgun and his wife's high school class ring. Burnett further testified that at one time he and Walker were

friends and that Walker had been in his home and was familiar with its layout.

Burnett identified the shotgun given to the police by Taubert as the one stolen from his residence. He also identified the ring found in Walker's boot as the one stolen from his residence. The shotgun used by Taubert in Branton's murder originally "belonged" to Walker. Walker sold Taubert the shotgun in August of 1984. Thus, the shotgun used by Taubert in the murder of Branton was stolen by Walker from Burnett's home. The introduction of the ring adds credibility to Taubert's story. Thus, the ring is relevant. The question remains, however, whether it was immediately apparent to the officer or whether he had probable cause to believe the Luray High School class ring found in a shoe in the home of Leslie Walker was of an incriminating character. We think not. The investigating officer had no way of knowing the ring was contraband or was connected in any way with the murder of Bud Branton. Thus, the plain view exception to the search and seizure rules is not available. The class ring was inadmissible and its introduction into evidence should have been objected to. However, there is no reasonable probability that the exclusion of the ring from evidence would have changed the result of the trial. Therefore, failure to object to its admission into evidence does not constitute ineffective assistance of counsel.

Appellant next alleges the trial court committed reversible error in admitting blood stained clothing found in a search of appellant's home.

Walker's home was searched and several items of clothing were taken for the purpose of determining whether the clothing contained any bloodstains. The clothing was tested by Susan Scholl, a forensics examiner for the K.B.I. Scholl's tests indicated blood on four of the items she examined, but she was unable to tell whether the blood was of human or animal origin. Nor could she testify as to how long the bloodstains had been on the clothing, or whether all the stains came from the same source. George Taubert did not testify regarding the clothing worn by Walker the night of the crime and therefore there was no evidence to connect the blood found on appellant's clothing to the murder of Eugene "Bud" Branton.

Thus, appellant argues the bloodstained clothing and Ms.

Scholl's testimony regarding the clothing were not relevant and should not have been admitted at trial.

K.S.A. 60-401(b) provides that "relevant evidence" is any evidence having any tendency to prove a material fact. To be admissible, evidence must be confined to the issues but need not bear directly upon them. For evidence of collateral facts to be competent, there must be some natural or logical connection between them and the inference or result they are designed to establish. *State v. Reed,* 226 Kan. 519, 524, 601 P.2d 1125 (1979).

By proffering the bloodstained clothing, the State apparently wanted the jury to infer the blood on the clothing was that of Bud Branton. However, there is no logical connection between the evidence and the suggested inference and it was error to admit this evidence.

K.S.A. 60-261 requires that we disregard any error or defect in a proceeding which does not affect the substantial rights of the parties. The erroneous admission of evidence in a criminal trial does not require a reversal of conviction in every case, but only where it is of such a nature as to affect the outcome of the trial and deny substantial justice. *State v. Yates,* 220 Kan. 635, 637, 556 P.2d 176 (1976).

Absent evidence of the bloodstained clothing, there was substantial and uncontroverted evidence of appellant's guilt. Taubert's testimony and the tape-recorded conversation provided the jury with more than enough evidence to convict Walker of the crimes charged and any error in admitting the bloodstained clothing was harmless.

Appellant submitted a pro se brief, filed out of time and without authority. We disregard it.

The judgment of the trial court is affirmed.