No. 71,907

STATE OF KANSAS, *Appellee*, v. KENNETH E. HADDOCK, *Appellant*.

(897 P.2d 152)

Opinion filed June 9, 1995.

*Danny K. Wiley*, of Murray, Tillotson & Nelson, Chartered, of Leavenworth, argued the cause, and *John C. Tillotson* and *Gary A. Nelson*, of the same firm, were with him on the brief for appellant.

*Richard G. Guinn*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Kenneth E. Haddock appeals his jury trial conviction of the first-degree murder, K.S.A. 1992 Supp. 21-3401, of his wife of 20 years, who was found beaten to death and lying under a pile of

wood in the garage of their Olathe home. Our jurisdiction is under K.S.A. 1994 Supp. 22-3601(b)(1) (a maximum sentence of life imprisonment was imposed).

The many trial errors asserted by Haddock, a former bank president, are separated for discussion into four groupings:

(1) The propriety of certain questions and comments by the State in cross-examining Haddock and in closing argument;

(2) the trial court's failure to suppress evidence based on alleged violations of Haddock's Fifth Amendment rights;

(3) evidentiary questions arising from the admission of evidence of marital discord, a prior federal bank fraud conviction, a polymerase chain reaction (PCR) DNA analysis, and expert opinion on blood spatters; and

(4) the trial court's failure to give a requested voluntary manslaughter instruction.

We find no error and affirm.

## FACTS

The five-day trial included over 40 witnesses and 100 exhibits. Although Haddock does not challenge the sufficiency of the evidence, a background review is helpful in understanding the issues presented.

Haddock has a college degree in agriculture education. He moved into banking and finance, eventually serving as president of two Kansas banks. In 1986, he started his own company, First Finance, Inc., which purchased loans from the FDIC and other institutions. He described First Finance as "very profitable."

Although Haddock and his three teenage children testified that their family was loving and supportive, a dark cloud loomed overhead. For two years preceding the murder, Haddock and his family lived with uncertainty and anxiety caused by his indictment and conviction for federal bank fraud.

### The Federal Bank Fraud Case

In September 1990, Haddock was indicted in federal court for bank fraud and related offenses arising from transactions in 1987. A jury convicted him on 10 counts. Haddock was sentenced to 42

months' imprisonment. He remained free on bond pending appeal. On appeal, the Tenth Circuit affirmed his conviction but remanded for resentencing. *United States v. Haddock*, 956 F.2d 1534, *modified on reh'g* 961 F.2d 933 (10th Cir.), *cert. denied* 113 S. Ct. 88 (1992); see also *United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993) (collateral claim of ineffective counsel denied; remanded for resentencing); *United States v. Haddock*, 50 F.3d 835 (10th Cir. 1995) (error found in restitution order of $76,000; remanded for recalculation of restitution). Haddock's first resentencing in the federal case was scheduled for December 18, 1992.

Thus, on November 20, 1992, the day of the tragedy, Haddock's conviction had been affirmed and he was awaiting resentencing. Haddock's attorney met with an Assistant United States Attorney and a probation officer from 10:30 a.m. to noon that day to negotiate matters relevant to the upcoming sentencing hearing. Haddock did not attend the meeting.

Haddock and his children admitted that the federal bank fraud case was stressful for them. In May and June of 1991, Haddock's wife, Barbara, spoke with two social workers, expressing "anxiety" and "anger" about the federal prosecution. However, neither social worker recalled Barbara mentioning any fear of violence from her husband. Haddock spoke with a marriage and family therapist in March 1992 about stress-related breathing problems experienced by his oldest daughter. He told the therapist that Barbara brought up the federal case "almost any time he would get in her presence," whereas he "tended to shy away from talking about it" because it was a "real hard thing to talk about."

Barbara's best friend, Kathy Finkleston, testified that she and Barbara often discussed the federal case and that Barbara would get very upset and emotional, "not knowing what was going to happen or what she was going to do." Finkleston said she believed Barbara was "becoming very frustrated" with the expense and duration of the federal case, and that "she was getting angry with Ken that it kept going on and on and on." Barbara told Finkleston that the retainer alone for Ken's Washington, D.C., lawyer was $40,000, and that whenever the lawyer asked for more money he wanted at least $25,000.

### The Hours Preceding Barbara's Death

Barbara's last day began early. She met Finkleston for breakfast at 6:30 a.m., something the two of them did often. She and Finkleston talked about Barbara's upcoming surgery, about their children, about Christmas, and then about the federal case and the meeting of attorneys scheduled for that day. Finkleston remembered that when Barbara brought up the federal case, she said, "Oh, my stomach just took a flip." Barbara then said that Haddock's lawyer was wanting additional money and that Barbara was concerned that they might have to dip into a savings account they had set aside for their son's college education. Overall, however, Finkleston believed that Barbara was in "pretty good spirits."

Barbara worked until around noon at her job as a triage nurse. She ran a couple of errands on her way home. Haddock went to work at First Finance from about 9:30 a.m. to 1:00 p.m., and then went home for lunch. Haddock and Barbara arrived home at the same time, around 1:20 p.m.

According to Haddock, when he first arrived home he and Barbara brought in groceries from her car. She told him the garage door had a problem, so he worked on it for a few minutes. He then ate a light lunch as Barbara made chili for the weekend. They discussed Barbara's upcoming surgery and their younger daughter's plans to have friends over that night. Haddock said he brought in the mail at about 1:45 p.m., then started a fire in the fireplace. The last thing he said he did before leaving was to throw two articles of clothing in the hallway by the washing machine. One was a white shirt he had been wearing; the other was a pair of slacks from his bedroom. Haddock testified that the shirt was missing a button and the slacks needed to be let out in the waist, and that Barbara said she would mend them. Haddock said he left home at approximately 2:00 p.m.

### Discovery

At around 3:20 p.m., the youngest daughter arrived home from junior high school. Barbara's car was in the driveway and the garage door was closed. She entered through the front door, noticed some chili cooking, saw the television on, and called out for her mother.

She was not concerned when she heard no reply, as nothing appeared out of the ordinary. Within minutes, the older daughter arrived home from high school.

The daughters eventually found Barbara in the garage buried under a pile of wood. They called 911. The older daughter summoned the neighbors, the Hartleys, who were registered nurses. When the Hartleys arrived, they cleared the remaining logs off of Barbara and checked for a pulse or respiration, but found neither.

The police arrived at 4:08 p.m. Haddock did not arrive home until 4:20 p.m. A daughter had called her father's office and left a message that he needed to come home right away. A neighbor and a police officer met Haddock at his car and escorted him inside through the front door to the living room. He embraced his daughters, who were crying. Haddock later tried to walk into the garage, but he was quickly stopped and told to stay inside the house. The police told Haddock that because his wife's death was "unattended," a police term meaning unattended by a physician, standard procedure required that the death be handled like a homicide until homicide could be ruled out.

### Investigation

Detectives at the scene quickly suspected foul play. Barbara's injuries were unlike those that might be expected from falling wood. In an autopsy, Dr. Bonita Peterson found bruises and abrasions on Barbara's hands and arms, consistent with defensive wounds. She also observed bruises and lacerations on the face, and massive trauma to the back of the head, which she thinks resulted from 6 to 12 blows with a blunt object.

Other evidence revealed an orchestrated crime scene. Detectives found a separate pool of blood a substantial distance from Barbara's body. Blood spatters and smears suggested that Barbara had been moved from this separate pool to the location under the wood pile. Blood was also found on Barbara's car, which was parked outside the garage. Drip patterns on the car suggested that the car had been moved after the blood was deposited. The location and nature of the blood spatter evidence on the car, when considered together with other blood spatter evidence inside the

garage, suggested that the beating occurred while the car was in the garage. Tomatoes were also splattered in various places on the garage floor. Nothing was missing from the home.

At approximately 6:00 p.m., as detectives continued searching for clues at the home, Haddock and his son accompanied Detective Larue to the Olathe Public Safety Center for questioning. In the interview, the detective observed and photographed two scratches on Haddock's right wrist that appeared fresh. Police also obtained Haddock's shoes from him at the center.

During the evening, the detectives at the center received updated information from the crime scene suggesting that the death was not accidental. The questioning of Haddock gradually grew more pointed and accusatory until Haddock finally broke it off and was taken home. Haddock never confessed. He was arrested five days later.

Physical evidence obtained from Haddock and from the scene played a key role in his identification as the killer. A small amount of blood was found on a shirt and pair of pants belonging to Haddock located on the floor inside the house. The shoes Haddock wore to the police center also had traces of blood on them. The blood on the clothing and shoes had DNA markings that matched Barbara's blood and excluded Haddock's blood. Blood spatter patterns were consistent with the pants and shoes being worn at the time the blood was deposited. Detectives also discovered two hairs clutched in Barbara's right hand. One hair showed DNA markings consistent with Haddock and inconsistent with Barbara, the other produced no marking.

### The State's Theory

The State's theory was that Haddock and Barbara were experiencing marital discord because of the federal bank fraud case, which led to a fight and then to the killing. The State argued that the 6 to 12 blows to the back of Barbara's head, some of them delivered after she was lying on the floor (according to blood spatter patterns), provided evidence of premeditation. The State asked the jury to infer that Haddock went from "acting on impulse" to realizing that he had gone too far to turn back and thus knew

"exactly what he was doing" in administering the multiple, lethal blows. Haddock then orchestrated the garage scene in an attempt to make the death appear accidental, hoping there would not be a rigorous investigation.

Under the State's theory, the attack probably occurred around 2:00 p.m. because a neighbor testified that she heard a strange, muffled, sound from outside, like wood falling on concrete, shortly after 2:00 p.m. that afternoon. Although no murder weapon was conclusively established, the State introduced evidence that the fireplace poker appeared to have been wiped clean, unlike the other fireplace tools in the set and unlike how the Haddock children remembered the condition of the poker.

## Haddock's Defense

Haddock denied killing his wife, advancing an alibi defense. A Wendy's restaurant sack found in his van had a receipt showing a purchase at 3:18 p.m. the day of the killing. The wristwatch that Barbara was wearing, which appeared to have been broken during the attack, showed a time of 3:16 p.m. Wendy's was more than 10 minutes away from the Haddock home. Haddock testified that he left home at approximately 2:00 p.m., went to the Olathe Public Library to do research for his federal case, then to Wendy's for a burger and milkshake, then out to look at some property for a possible investment purchase by his company, and then back to the office, where he was immediately told by his secretary to go home.

As for the DNA evidence obtained from his shoes and the clothes found inside the house, Haddock argued that Barbara's blood could have been transferred to his shoes when he embraced his daughters, who carried their mother's blood from their attempts to help her. He advanced a similar theory (the daughters rushing back and forth from garage to the 911 call) to explain Barbara's blood on his clothes found lying on the floor near the laundry room.

The State attacked his alibi. The two front desk clerks at the Olathe Public Library who worked that Friday afternoon testified that it was a "slow afternoon" and that they did not remember seeing Haddock or anyone resembling Haddock in the library. The

State introduced evidence of a watchmaker who examined and tested Barbara's watch. He determined that the hands could have been manipulated to show any time after it had been broken. The State argued that the watch was part of the orchestrated crime scene.

## DISCUSSION

Haddock asserts a cluster of trial errors arising from the admission of certain of Haddock's conversations the day of the murder.

### Prosecutor's Comments on Haddock's Silence

Haddock first contends that the prosecutor made improper references at trial to his post-*Miranda* silence. He challenges two areas of inquiry by the prosecution: (1) his failure to explain before trial that he took off a shirt at lunchtime so Barbara could replace a missing button, and (2) his failure to express concern that his children might be in danger from Barbara's at-large killer. The State contends that both inquiries were permissible forms of impeachment. We agree.

During his direct examination, Haddock testified that he took off a shirt at lunchtime and threw it on the floor by the laundry room because it was missing a button and Barbara had offered to fix it. On the night of the murder, however, Haddock told Detective Larue that he did not change shirts that day, but only added a sweater. Two other witnesses, Hartley and Officer Ridley, also testified about what Haddock said concerning his clothing that night. Neither witness heard Haddock mention changing shirts due to a missing button.

The prosecutor focused on these inconsistencies in the following exchange with Haddock, from which the challenged question arises:

"Q:   Sir, would you agree that you told Detective Larue the shirt you had on during that interview, a short-sleeved shirt, was the shirt that you had on all day that day?

"A:   I mistakenly said that, yes.

.   .   .   .

"Q: Would you agree, Mr. Haddock, that you never made any mention to Detective Larue at the present time during this interview that you had taken a shirt off, and then also brought a pair of pants down to a location inside the house where you've alluded to?

"A: I did not recall that at the time.

. . . .

"Q: *Would you agree, sir, that this is the first time this week that we've heard you indicate to anybody that you took that shirt off while you were home, because your wife thought there was a button missing, and she wanted to take care of it for you?*

"[Defense Counsel]: Objection. That's an improper question, Judge. That's a direct comment on his Fifth Amendment rights.

"[Prosecutor]: No, it is not, Judge. He's made several statements to several people.

"[The Court]: Court will overrule the objection, allow the answer.

"A: *I have never commented to the police or to your office since November 20th.*

. . . .

"Q: My question was: Did you ever mention to any of the neighbors, Frank Hartley, Joenne [sic] Bate, or anybody else or Sergeant Ridley, who asked you about your clothing situation, anything about having removed that shirt because your wife wanting to do some work on it?

"A: I don't recall." (Emphasis added.)

Due process prohibits the State from eliciting evidence at trial of an accused's silence at the time of arrest, after receiving *Miranda* warnings. *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); *State v. Gadelkarim*, 256 Kan. 671, 685, 887 P.2d 88 (1994).

It is not unconstitutional, on the other hand, to reveal an accused's pre-arrest and pre-*Miranda* silence, although such evidence may be excludable on other evidentiary grounds, such as a lack of probative value. See *Fletcher v. Weir*, 455 U.S. 603, 71 L. Ed. 2d 490, 102 S. Ct. 1309 (1982).

*Doyle* applies to prior silence by an accused, not prior statements. *Anderson v. Charles*, 447 U.S. 404, 408, 65 L. Ed. 2d 222, 100 S. Ct. 2180 (1980). When a defendant makes statements to police or others outside of custodial interrogation, or when a defendant in custody waives the right to silence and speaks to police, then the State is free to impeach trial testimony by showing incon-

sistencies in prior statements. *State v. Wood*, 230 Kan. 477, 480, 638 P.2d 908 (1982).

A timely and specific objection to the challenged question or comment is necessary to preserve a *Doyle* issue for appeal. *State v. Fisher*, 222 Kan. 76, 83-84, 563 P.2d 1012 (1977). On review, we examine the record to determine whether the prosecutor committed constitutional error. See *Gadelkarim*, 256 Kan. at 685. That inquiry focuses on whether the language used by the prosecutor was "manifestly intended," or "was of such character that the jury would naturally and necessarily take it to be," a comment or question about a defendant's post-*Miranda* silence. 256 Kan. at 685.

Haddock contends that the question reflects on his silence after the interrogation on November 20, 1992, and thus is improper. The prosecutor's response to the objection and attempt to clarify his question suggest that he did not manifestly intend to bring up the subject of Haddock's silence. The prosecutor responded to the objection by saying that Haddock had made "several statements to several people," thus implying that he was merely trying to emphasize Haddock's inconsistent prior explanations.

We do not think the jury likely or necessarily would have interpreted the prosecutor's question as a comment on Haddock's silence. Rather, the statement was likely interpreted as a reference to prior witnesses' testimony heard earlier that week. The trial began Monday, October 25, 1993. The cross-examination at issue took place Friday, October 29. Earlier that week, during the State's case, several people including Frank Hartley, Officer Ridley, and Detective Larue, had testified about statements they heard Haddock make about his clothing on the night of the murder.

Haddock cites *State v. Lofquest*, 227 Neb. 567, 418 N.W.2d 595 (1988), and *State v. Guerra*, 161 Ariz. 289, 778 P.2d 1185 (1989). Both cases are distinguishable from the case at bar. In *Lofquest* and *Guerra*, the prosecutors' comments were clear references to the defendants' invocation of their right to remain silent. In the present case, Haddock talked to police and others at length. The challenged question by the prosecutor was a reference to Haddock's failure to tell police and others the same explanation that he gave at trial. We find no error in the prosecutor's question.

## Danger of a Suspect At-Large

Haddock next challenges a series of questions or statements by the prosecutor, all related to the inconsistency between Haddock's actions after the murder and his theory that he was not involved. The essence of the prosecutor's questions and comments was that Haddock never expressed any fear for the safety of his children on the night of the murder, which might be expected if Haddock was innocent and was told that his wife's death was not accidental.

Haddock contends that the statements were impermissible comments on his post-*Miranda* silence. He has failed to preserve this issue for appeal because no objection was made to the statements on that ground during trial. *Fisher*, 222 Kan. at 83-84. The contention lacks merit in any event. Haddock made numerous statements to police and others before exercising any constitutional right to remain silent. The fact that the prosecutor's tactic was to identify something missing from Haddock's statements that arguably might naturally be there—concern for the safety of his children—does not mean that the statements were directed at Haddock's protected "silence." See *State v. Taylor*, 223 Kan. 261, 264, 574 P.2d 210 (1977).

## Comments by the State at Trial

Haddock next contends that because a part of his interview with police was suppressed by the trial judge, the prosecutor's statement in closing argument that "the defendant, the *entire night*, never once . . . inquired about the safety of his family" (emphasis added) was improper because it necessarily referred to a portion of the interview that was suppressed, as well as the portion not suppressed. Again, the contention fails for lack of a timely objection on the "entire night" ground. The jurors were unaware that a part of his interview was suppressed. As far as the jurors knew, the term "entire night" was a reference only to the admissible portion of the interview—the only portion of which they were aware. Haddock does not say how he was prejudiced by the statement.

Finally, Haddock contends that a question by the prosecutor violated the State's own motion in limine, which sought to prevent

Haddock from speculating about other possible suspects. Counsel objected to one of the prosecutor's inquiries about other possible suspects. The prosecutor acknowledged his error and withdrew the question. The trial court sustained the objection and instructed jurors to disregard it. Haddock did not move for a mistrial. We find no reversible error.

## Haddock's Statements at the Police Station

Haddock argues that the trial court erred in refusing to suppress the entire interview with Detective Larue on the night of the murder. Except for purposes of impeachment, the trial court suppressed the last 20 pages of the 51-page transcript of Haddock's interrogation. The first 31 pages of Haddock's interview were ruled admissible, however, and the State used excerpts from this interview to show inconsistencies in Haddock's story. The first phase of the interview, which was deemed admissible by the trial court, began at approximately 7:30 p.m. and continued until 9:09 p.m. The second phase began at 9:59 p.m. and lasted until 11:02 p.m. The third phase began at 12:32 a.m. and lasted until 1:25 a.m. A substantial portion of the second phase and all of the last phase of the interview were suppressed because the trial court found that Haddock had invoked his right to a lawyer at the bottom of page 31 of the transcript of the interview.

Haddock asserts that a statement made by Detective Larue at the start of the interrogation was misleading, deceptive, and tainted the "waiver of his *Miranda* rights." The challenged statement occurred as Larue verbally recited to Haddock the *Miranda* warnings:

"Q. You have the right to talk to a lawyer and have him present with you while you are being questioned. Do you understand that?
"A. Yeah. *Is there any reason for me to?*
"Q. *Not at this point, I don't.*
"A. Okay." (Emphasis added.)

Detective Larue proceeded to advise Haddock that if he could not afford to hire a lawyer, one would be appointed to represent him during questioning if he wished. Larue also advised Haddock that he could "decide at any time to exercise these rights." Haddock said that he understood. Before reading Haddock the *Miranda*

warnings, the detective informed Haddock that he was not in custody and he was free to leave at any time.

After the suppression hearing and after reviewing the videotape, the trial court ruled that Haddock was not in custody during his questioning at the police center. The trial court reasoned that Haddock was not under arrest. He was told he was free to leave, and he did in fact leave freely that evening. The trial court further held that the detective's response to Haddock's question about an attorney was not misleading, and that Haddock "voluntarily and knowingly without duress, coercion or promises proceeded to answer questions of the officer."

"If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court." *State v. Garcia*, 250 Kan. 310, 318, 827 P.2d 727 (1992).

Haddock first makes the argument that whether he was in "custody" is irrelevant to the question of whether his statements should be suppressed. Haddock argues that his *Miranda* rights were violated by Detective Larue's answer to his question whether he had any reason for a lawyer. He dismisses the importance of "custody" by arguing that when police give a suspect *Miranda* warnings, even in a noncustodial setting, they thereby promise to "honor the defendant's constitutional rights" and the full protections of *Miranda* therefore apply.

Custody would not matter if Haddock was contending that his statements were obtained through coercion, threats, or duress, or other involuntary means violating due process. See *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987) (noting that even if *Miranda* rights are not violated, statements may be inadmissible if made involuntarily). However, the "constitutional rights" Haddock seeks to enforce—the safeguards against self-incrimination established by *Miranda*—do not exist outside "custodial interrogation." See, *e.g.*, *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994); *State v. Fritschen*, 247 Kan. 592, 597, 802 P.2d 558 (1990) ("*Miranda* only applies if the interrogation was custodial."). Although we have never addressed the question directly, other courts have held that the giving of *Miranda* warnings, itself, does

not transform a noncustodial interrogation into a custodial interrogation. *United States v. Charles*, 738 F.2d 686, 693 n.6 (5th Cir. 1984); *United States v. Lewis*, 556 F.2d 446, 449 (6th Cir.), *cert. denied* 434 U.S. 863 (1977). We agree with the view expressed in *Charles* and *Lewis*. We have expressed our reluctance to place controlling weight on any one factor in the analysis of whether a suspect was in "custody." See *Fritschen*, 247 Kan. at 603.

Haddock argues that *State v. Ninci*, 19 Kan. App. 2d 192, 865 P.2d 1078 (1993), *rev. denied* 254 Kan. 1009 (1994), is "almost an .identical case." He fails to note that *Ninci* was 'decided before the United States Supreme Court filed *Davis v. United States*, 512 U.S. ___, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994). After *Davis*, we overruled *Ninci* in *State v. Morris*, 255 Kan. 964, Syl. ¶ 4, 880 P.2d 1244 (1994). In any event, *Ninci* assumed the interrogation was custodial, and therefore it is distinguishable.

We agree with the trial court that Haddock's interview was not custodial at the outset and find no error in the trial court's refusal to suppress the entire interview.

## Haddock's Shoes

Haddock contends that the trial court should have suppressed his shoes and the blood and wood chips found on them because his consent came after he had invoked his *Miranda* rights. Detective Larue asked Haddock for his clothing and shoes at the police center. Haddock indicated he might like to speak to an attorney. The interview recessed from 11:02 p.m. to 12:32 a.m., and Haddock was provided a phone book and a phone with privacy.

Haddock's consent to the seizure of his clothing took place after he called the attorney. Haddock therefore contends that the physical evidence should have been suppressed. The State argues that Haddock did not raise this issue before the trial court.

Constitutional grounds asserted for the first time on appeal are not properly before the appellate court for review. *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993). We are unable to find in the record where Haddock raised a specific constitutional objection to the admissibility of the shoes and clothing obtained from him during the interview on the night of the murder. The

only written motion to suppress in the record contains a broad request to suppress numerous items, including his shoes, clothing, and wood chips. The motion addresses, however, only those items obtained in a search of Haddock's home and automobiles.

. Haddock argues on appeal that such evidence was "fruit of the poisonous tree" and should have been suppressed after the trial judge ruled that his statements beyond page 31 of the transcript were suppressed. He did not object to such evidence on that basis at trial. Haddock has failed to preserve this issue for appeal.

## The Evidentiary Issues

The admission or exclusion of evidence, subject to exclusionary rules, is within the trial court's discretion. *State v. Coleman*, 253 Kan. 335, 344, 856 P.2d 121 (1993). Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *State v. Baker*, 255 Kan. 680, Syl. ¶ 9, 877 P.2d 946 (1994).

## Marital Discord

Haddock argues that the trial court improperly admitted evidence of marital discord.

· The State introduced the following evidence to prove friction and discord between Haddock and his wife before the murder: Haddock's federal bank fraud conviction; Barbara's comments to counselors in May and June of 1991 about how "angry" and "stressed out" she felt because of the bank case; Haddock's comment to a social worker in March 1992 that his daughter's stress-related ailments might be connected to his bank case; Haddock's comment to the social worker that his wife wanted to talk about the bank case all the time, whereas he preferred not to talk about it; testimony from Barbara's best friend about how Barbara talked about the strain the bank case placed on her and how Barbara became very emotional during significant events in the bank case; evidence that Barbara was aware that a meeting between attorneys relating to Haddock's upcoming sentencing was scheduled for November 20, 1992, the day of the murder; and two books found in Haddock's possession, one in his closet and the other in his van

(both had pieces of paper marking pages relating to the financial aspects of divorce).

Haddock argued in a pretrial motion that the marital discord evidence should be excluded as irrelevant, unduly prejudicial, and inadmissible under K.S.A. 60-455. Haddock renewed his earlier objections to such evidence at trial, thus preserving the issue for appeal.

The State alleges that the marital discord evidence introduced at trial was offered to show Haddock's motive and intent to murder his wife. We have recognized: "As a general rule, in the case of marital homicide, evidence of a discordant marital relationship and the defendant's previous ill treatment of the spouse is relevant as bearing on the defendant's motive and intent." *State v. Mayberry*, 248 Kan. 369, 384, 807 P.2d 86 (1991). No specific "marital discord" provision is contained in the Kansas Rules of Evidence. K.S.A. 60-401 *et seq.*

Haddock argues that "previous ill treatment" such as violence or intimidation must be shown in order for marital discord evidence to be admissible. Most prior marital homicide cases in Kansas addressing the admissibility of marital discord evidence involved evidence of prior violence, threats, or intimidation by the defendant. No such evidence was presented in the case at bar.

Although most marital homicide cases have arisen, predictably, out of abusive relationships, that does not mean evidence of prior discord between a defendant and a victim must rise to a violent level to be admissible. Haddock cites no cases excluding evidence of marital discord simply because the discord did not involve violence, threats, or intimidation.

There should be limits, of course, on the admissibility of marital discord evidence in marital homicide cases. Admissibility properly rests in the sound discretion of the trial court.

In the instant case, the State's theory of Haddock's motive and intent to murder his wife rested entirely on the theory that there was marital discord. The State was not using marital discord evidence to buttress another theory of the murder. Thus, evidence of marital discord was probative to the case as presented by the State.

The likelihood of unfair prejudice to Haddock because of the marital discord evidence was reduced by several factors. First, Haddock was not unfairly surprised by the admission of the evidence, and therefore he was able to counter the State's evidence with his own evidence tending to show that his relationship with Barbara was healthy. Two of his children testified that he and Barbara were "very close," "very, very supportive of each other," a "very loving couple," and that "they made quality time to spend together." His attorney in the bank fraud case testified that there was reason for Haddock and his wife to be optimistic at the time of the murder about the direction the federal case was heading. On cross-examination of the State's marital discord witnesses, defense counsel elicited admissions that they had never heard Barbara complain of any violence, threats, or intimidation by Haddock.

Second, the trial judge gave a limiting instruction specifically addressing marital discord evidence. In light of the probative nature of the marital discord evidence under the State's theory of the case, the variety of sources from which the evidence was introduced, and the factors mitigating the likelihood of prejudice, the trial court did not abuse its discretion in admitting marital discord evidence.

## The Bank Fraud Conviction

Haddock argues that the trial court erred in admitting evidence of his federal bank fraud conviction. Haddock filed a pretrial motion to exclude any evidence of the federal case under K.S.A. 60-421 and K.S.A. 60-455, or, in the alternative, to require that counsel and witnesses refer to the matter as the "federal proceeding." The trial court denied both requests and admitted evidence of the prior conviction at trial over Haddock's renewed objection. The trial court suggested that the evidence of Haddock's prior conviction "is relevant and is evidence of marital discord in this case."

On appeal, Haddock assumes that the trial court admitted the evidence of his prior conviction under K.S.A. 60-455 and argues that this was improper. He does not contend, as he did before trial, that K.S.A. 60-421 (evidence of a crime not involving dishonesty

or false statement, inadmissible for purpose of impairing credibility) required exclusion of the evidence.

Haddock first challenges the relevance of his bank fraud conviction to the question of motive. He rightly points out that under the State's theory, the alleged connection between his fraud conviction and his motive to murder his wife is more attenuated than the connection in *State v. Ruebke*, 240 Kan. 493, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987). Haddock argues that, in contrast to *Ruebke*, he "had no reason to kill his wife because of the federal conviction" because he had "nothing to gain."

According to the State's theory, Haddock may have hoped to gain one or more of the following: relief from Barbara's constant inquiries about the federal case, a sore subject; avoiding a costly divorce; or avoiding potentially severe consequences, such as divorce or criminal prosecution, from losing his temper and beating his wife. Each of those theories had additional evidence to support it.

"Relevant evidence" is any evidence having any tendency to prove a material fact. K.S.A. 60-401(b). "To be admissible, evidence must be confined to the issues but need not bear directly upon them." *State v. Walker*, 239 Kan. 635, 644, 722 P.2d 556 (1986). Haddock's federal conviction could have been deemed relevant to the nature, source, and timing of his alleged marital discord, which was relevant to the issue of motive and to the issue of identity. The trial court did not abuse its discretion in finding Haddock's federal conviction to be relevant evidence.

Haddock contends that even if his federal conviction is relevant, the trial court failed to "make any finding that balanced the probative value of the evidence against the prejudicial effect," citing *State v. Faulkner*, 220 Kan. 153, 551 P.2d 1247 (1976). Such a finding may be implied from the circumstances. The defense objected to the evidence, contending that "the prejudicial effect of the federal conviction outweighs any probative value that it may have." The trial court allowed the testimony, without explanation. Haddock cites no authority requiring the trial court to articulate its probative-prejudicial balancing act for the record.

Moreover, the trial court took two precautions to reduce the prejudicial effect of the evidence of Haddock's prior conviction. The judge orally instructed the jury that

"you should not consider the fact that defendant was convicted of financial institution fraud in the Federal Court matter as evidence of guilt in this matter. You're instructed to consider that only along with all of the other evidence in the case, in hearing the evidence, but the mere fact that he was convicted of an unrelated matter is not to be considered by you as evidence, that because of that he committed this crime."

Also, the judge submitted a similar written instruction to the jury.

Haddock further contends that in cross-examining his bank fraud attorney, the State "went beyond the bounds of using the federal conviction as the basis for marital discord, and . . . simply elicited testimony regarding the bank fraud of which the sole purpose was to prejudice the jury." The cross-examination touched upon rulings in the federal case that came after November 20, 1992, and upon the amount of money that Haddock had paid in legal fees.

Haddock argues that rulings in the federal case after November 20, 1992, have no possible relevance on marital discord as a cause of the murder. While that may be true, the cross-examination at issue was conducted for a different purpose. On direct examination, the attorney testified that in November 1992 his optimism as to Haddock's chances for a new trial in the federal case was "very high." On cross-examination, the State obtained admissions from the attorney that the motions for new trial pending in November 1992 were later denied. Thus, the cross-examination at issue went to the credibility of the testimony that there was optimism in the Haddock family about the federal case in November 1992.

## Wood Chips in Haddock's Shoe

Haddock objected to admission of two small wood chips found in his left shoe, which police obtained the night of the murder. He contends that the wood chips should not have been admitted because a trace evidence analyst was unable to conclusively link the wood chips to the wood pile in the garage. The trial court held that

Haddock's objection went to the weight of the evidence rather than admissibility. We agree.

Haddock relies on *State v. Walker*, 239 Kan. 635. *Walker* is easily distinguishable. In *Walker*, the bloody shirt found in the defendant's home was not found until five months after the murder. The forensic examiner could not determine whose blood was on the shirt, or even whether the blood was of human or animal origin. There was no evidence about whether the shirt belonged to the victim or the defendant. We held that admission of the bloody clothing was erroneous (though harmless error). 239 Kan. at 644.

By contrast, in the case at bar, although the wood chips were of insufficient quality to compare with the wood in the garage, they were obtained from Haddock's shoes on the night of the murder, just hours after the alleged event. Barbara was found buried under a pile of wood. The shoes were also found to contain blood spots, which matched the victim's blood. There was sufficient corroborating evidence to raise a reasonable inference that the wood chips came from the wood pile in the garage. The trial court did not abuse its discretion in admitting the wood chips into evidence.

## DNA Evidence

The State introduced DNA test results from blood found on Haddock's shoes, his pants found near the laundry room, and a single hair clutched in Barbara's hand. The evidence came in through the testimony of Dr. Robert C. Giles, the scientific director at Gene Screen, a laboratory in Dallas, Texas.

Haddock contends that the State did not introduce sufficient foundational proof that Gene Screen followed standard and proper procedures when it performed its PCR tests. Haddock does not challenge PCR testing generally; rather, he challenges the *specific* procedures used by Gene Screen and the lack of evidence as to whether Gene Screen's procedures measure up to the scientific community's standards for PCR testing.

The DNA evidence in the instant case obtained through PCR testing differs substantially from the RFLP analysis discussed and upheld in *Smith v. Deppish*, 248 Kan. 217, 230-39, 807 P.2d 144 (1991). The technical differences between PCR and RFLP testing

are discussed in detail in Annot., Admissibility of DNA Identification Evidence, 84 A.L.R.4th 313, 320-23. We have approved PCR testing in *State v. Hill*, 257 Kan. 774, 895 P.2d 1238 (1995).

In the present case, Dr. Giles testified that Haddock's blood DQ Alpha type is 1.1, 4, and that Barbara's is 1.1, 1.2. According to Dr. Giles, about 7.4 percent of the Caucasian population share Haddock's type, and about 5.4 percent share Barbara's type.

Gene Screen determined that the blood on Haddock's shoes and on his pants found near the laundry room was 1.1, 1.2, the same type as Barbara's. The hair found in Barbara's hand, meanwhile, was determined to be 1.1, 4, matching Haddock's type.

We initially question whether Haddock raises the same objection to the DNA evidence on appeal that he did in the trial court. A defendant cannot raise points on appeal which were not presented to the trial court. *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993), see K.S.A. 60-404. We extend Haddock the benefit of the doubt as to whether the issue is preserved for appeal.

On appeal, Haddock cites the *Frye* test, see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which we have adopted for the admissibility of new scientific evidence. Haddock specifically contends "that a third prong exists as to the requirement of a foundation regarding the actual procedures used in this case, and that foundation was not established." Haddock relies on *People v. Castro*, 144 Misc. 2d 956, 545 N.Y.S.2d 985 (N.Y. Sup. Ct. 1989) for the third prong of his suggested analysis. We rejected the same argument in *Deppish*, 248 Kan. at 236-38; see *State v. Witte*, 251 Kan. 313, 324, 836 P.2d 1110 (1992). The focus of the "third prong" that Haddock advocates is not on the reliability of the new scientific theory generally, but on the reliability of the specific procedures used by the laboratory which performed the tests sought to be introduced into evidence.

The trial court in this case did not reach its decision to admit the DNA evidence in an unreasonable manner. Rather, the trial court conducted a hearing during the preliminary hearing where the *Deppish* benchmarks were applied, as well as a *Frye* analysis. The State's expert witness, Dr. Giles, testified concerning the acceptance of the scientific community to the theory and techniques

of PCR analysis and its application in Haddock's case. His testimony enabled the trial court to consider the credibility and weight of the testimony in rendering a reasoned decision. The trial court ruled

"that the DNA testing performed in preparation of this case followed the procedures which are widely accepted in the scientific community, and the Court finds, from the evidence, that the methodology is sound and reliable within this appropriate community. That the testing and analysis are admissible, and the Court finds that they have been recognized as reliable, have gained general acceptance in the scientific community, involve scientifically and professionally established techniques and meet the requirements pursuant to law. The Court further finds that the techniques used in these tests are capable of producing reliable results."

Haddock filed a pretrial motion in limine seeking to exclude the DNA evidence. At trial, his counsel objected before Dr. Giles' testimony, stating the "Court knows our position, that it's not sufficiently shown to be reliable for the procedures in this case." The trial court granted a standing objection.

Dr. Giles testified at length at trial, using 10 slides to assist in his explanation of the Gene Screen PCR testing process. At the conclusion of his explanation, the State asked if the Kenneth and Barbara Haddock samples were typed through the process he had described. Dr. Giles answered, "Yes, they were." Haddock neither objected to Dr. Giles' testimony on the lack of evidence that Gene Screen followed its PCR testing procedures meticulously, nor did he call an expert to counter Dr. Giles' testimony.

Our decision in *State v. Hill* resolves the question of PCR testing being recognized as receiving wide scientific acceptance. Our description of the *Frye* test in *Deppish*, 248 Kan. at 236, and Dr. Giles' testimony that the Haddock samples were subjected to the laboratory analysis described in his testimony disposes of Haddock's contention on appeal that the procedures used in the instant case were not established.

## Blood Spatter Evidence

Haddock's final evidentiary contention concerns the qualifications of crime scene investigator William L. Chapin, who was testifying for the first time as an expert on blood spatter interpreta-

tions. Haddock does not challenge the admissibility of blood spatter evidence generally. Haddock concedes that Chapin is "potentially an expert in several fields" related to crime scene investigation, but he contends that "blood spatter interpretation is simply not one of those fields."

Expert opinion testimony is allowed on matters "within the scope of the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456(b). Chapin, who was employed at the Johnson County Sheriff's Office in the Criminalistics Laboratory, testified that he has degrees in biology and chemistry from Sterling College in Kansas. He has 20 years of experience in many facets of criminal investigation, such as laboratory analysis, crime scene analysis, and evidence collection, including 15 years in Johnson County. He has testified from 15 to 30 times regarding crime scene analysis, and over 600 times concerning various aspects of forensic work.

With respect to blood spatter interpretation, Chapin attended a one-week intensive course on blood spatter evidence taught by national experts in the field. There were approximately 12 to 15 people in the class. Chapin spent the entire week conducting experiments and learning about the different kinds of blood spatters and how they are created. He stated he did "some type of [blood spatter] analysis" in an average of 10 cases per year. Here, Chapin spent approximately 10 hours at the Haddock home inspecting and analyzing evidence of blood spatters.

Chapin's qualifications are comparable to those other reviewing courts have found sufficient for blood spatter experts. See, *e.g.*, *State v. Moore*, 458 N.W.2d 90 (Minn. 1990) (serologist; no formal training or education in blood spatter evidence; had done 30 to 35 blood spatter interpretations); *State v. Moore*, 122 N.J. 420, 585 A.2d 864 (1991) (detective; never testified as blood spatter expert; attended one-day seminar in blood spatter analysis). We find no abuse of discretion in allowing Chapin to give blood spatter testimony.

## Lack of Instruction on Voluntary Manslaughter

Haddock contends that the trial court erred in rejecting his re-

quested jury instruction for the lesser offense of voluntary man-slaughter. The jury received instructions for first-degree and second-degree murder.

The rules concerning the necessity of lesser included offense instructions are well established and need not be repeated. See *State v. McClanahan*, 254 Kan. 104, Syl. ¶¶ 1, 2, 865 P.2d 1021 (1993). Voluntary manslaughter "is the unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion." K.S.A. 21-3403. Haddock argues that there was sufficient circumstantial evidence to support an instruction for voluntary manslaughter.

The State does not dispute that an altercation between Haddock and his wife preceded the killing. The State argued that very fact in closing argument. Mere evidence of an altercation, however, does not alone support a finding of sufficient provocation. We have found the evidence insufficient for a voluntary manslaughter instruction in spite of evidence of some kind of altercation between the defendant and victim just before the killing. See, *e.g., State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 (1978); *State v. Stafford*, 213 Kan. 152, 166, 515 P.2d 769 (1973) (in dicta); *State v. McDermott*, 202 Kan. 399, 401-03, 449 P.2d 545, *cert. denied* 396 U.S. 912 (1969).

In *State v. Coleman*, 253 Kan. 335, 352-54, 856 P.2d 121 (1993), we clarified prior cases in holding that evidence supporting a lesser included offense instruction may be presented either by the defendant or the State. In the case at bar, however, neither Haddock nor the State presented evidence of precisely what provoked or preceded Barbara's murder. The person who could have supplied the missing evidence of provocation in this case was the last person to see her alive. Haddock, however, denied having any kind of altercation with his wife.

The State argues that *State v. Pearson*, 234 Kan. 906, 678 P.2d 605 (1984), is analogous, and we agree. Pearson was convicted of second-degree murder of a young woman, whose body was later found in a field outside Wichita. Pearson, who was the last person seen with the victim, denied being with her when she was killed. Other physical evidence strongly linked him to the murder. On

appeal, he contended that he should have received a voluntary manslaughter instruction because the evidence reasonably supported an inference that the victim and her killer went to the field to engage in sexual activity but had a fight, during which the fatal blow was struck. We rejected his contention, noting that neither the State nor the defendant presented any evidence supporting voluntary manslaughter. 234 Kan. at 918-19. We find no error in refusing to give an instruction on voluntary manslaughter.

Affirmed.