No. 79,155

STATE OF KANSAS, *Appellee*, v. CLEAVE SIMS, *Appellant*.

(960 P.2d 1271)

Opinion filed May 29, 1998.

*Richard Ney*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Charles R. Reimer,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Cleave Sims, from his convictions by a jury in Sedgwick County, Kansas, of one count of first-degree felony murder, two counts of aggravated battery, and one count of criminal discharge of a firearm. In total, the trial court sentenced Cleave to life in prison plus a consecutive 60 months. Cleave appeals his convictions and sentences.

This is a drive-by shooting case. Cleave's brother, Essex T. Sims, rode in the front passenger seat and did some of the shooting while Cleave drove the car. Many of the issues in Essex's case are controlling in this case and will be referred to as the various issues are discussed. See *State v. Sims,* 262 Kan. 165, 936 P.2d 779 (1997). Essex and Cleave were jointly tried. Thus, the facts are the same and are fully set forth in 262 Kan. at 166-68. We will not repeat them here except as necessary in discussing the issues.

## I. SELF-DEFENSE

Cleave's defense counsel requested that the trial court instruct the jury on self-defense pursuant to PIK Crim. 3d 54.17. The trial court denied his request and refused to provide the jury with an instruction on self-defense. Cleave challenges the trial court's ruling on appeal. Essex also raised this issue in his appeal, which this court rejected. In rejecting Essex's claim, this court stated:

"[Essex] Sims argues the evidence indicates the jury could have found he acted in self-defense because (1) the Glock found inside the Thomas home had fired at least two rounds; (2) two vehicles across the street from the Thomas home were damaged by gunfire; (3) a neighbor heard rapid return fire from the Thomas home; and (4) Lamont Sanders testified he saw Carlton Stokes aim a Glock at [Essex] Sims' vehicle right before gunfire commenced.

"*If [Essex] Sims had acknowledged participation in the gunfire,* then this evidence would likely have required the self-defense instruction. However, [Essex] Sims' theory of defense was that he did not participate in the shooting. He attempted to discredit witnesses who said they saw him holding a weapon. Sanders, the primary defense witness, denied having knowledge of weapons in [Essex] Sims' car or of any cars following behind [Essex] Sims' vehicle.

"There was absolutely no evidence proving the subjective component of self-defense, that [Essex] Sims honestly believed he had to kill in self-defense. The trial court's failure to instruct on self-defense was not clearly erroneous, and this issue fails." (Emphasis added.) 262 Kan. at 172-73.

Cleave acknowledges this court's ruling regarding this same issue when it was previously raised by Essex in his appeal. However, Cleave claims that the issue presented herein is different than the issue presented in Essex's appeal. This is because Cleave specifically requested a self-defense instruction at trial; whereas, Essex made no such request at trial for an instruction on self-defense. Thus, Essex's appeal of this issue to this court was analyzed under a "clearly erroneous" standard of review. Cleave asserts that this standard of review does not apply to his appeal of this issue since he requested a self-defense instruction at trial. As such, Cleave asks this court to reanalyze this issue in his appeal, regarding an instruction on self-defense, under a less rigid standard of review.

Cleave is entitled to a different standard of review in his appeal of this issue than Essex was entitled to. Essex did not request a jury instruction on self-defense at trial. This court found that the trial court's failure to give an instruction on self-defense was not clearly erroneous and thus was not in error.

However, Cleave did specifically request an instruction on self-defense at trial.

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of the trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992).

In analyzing this issue, the court must view the evidence in the light most favorable to Cleave, the party who requested the instruction, as opposed to viewing it under a clearly erroneous standard of review, as the court did in Essex's appeal. As such, Cleave is entitled to an independent analysis of this issue, under a different standard of review, regardless of this court's ruling in Essex's case.

The circumstances in which a defendant is entitled to an instruction on self-defense are discussed in *State v. Childers*, 222 Kan. 32, 48, 563 P.2d 999 (1977), wherein this court stated: "[I]n order

to rely on self-defense as a defense, a person must [1] have a belief that the force used was necessary to defend himself and, also, [2] show the existence of some facts that would support such belief." Further, the *Childers* court stated that in judging whether the evidence justifies a self-defense instruction, " 'it is well to remember the test is not how much but is there any' " evidence that a defendant believed force was necessary to defend himself. 222 Kan. at 49. Also, Cleave cites *State v. Hill*, 242 Kan. 68, 78, 744 P.2d 1228 (1987), which held: "It is the duty of the trial court to instruct the jury on self-defense so long as there is any evidence tending to establish self-defense, although the evidence may be slight and may consist solely of the defendant's own testimony."

According to Cleave, there was some factual evidence presented at trial which indicated that he had a reasonable belief that force was necessary to defend himself. For instance, Lamont Sanders, the person who sat in the back seat of Cleave's car on the day in question, testified that as the car drove by the house on Fountain Street, he saw Carlton Stokes, who was standing in the yard outside the house, point a handgun at the car. Sanders testified that it was not until after Stokes pointed his gun at the Sims' car that the shooting began. Further, Cleave claims that the evidence presented at trial clearly proved that some shots were fired from the house. Gary Miller, a tool marks and firearm examiner for the Wichita Police Department, testified that two of the spent shell casings recovered from around the location of the shooting came from a gun that was found in the Fountain Street house in a clothes dryer. There is evidence that vehicles on the opposite side of Fountain Street from the house in question were hit by bullets, indicating that shots were fired from the house in the direction of the car Cleave was driving. Finally, one of the neighbors, Martin, testified that gunfire came from the house toward the cars driving past the house. Martin stated the shots came from the car first. However, because gunfire from the house returned the gunfire from the car so quickly, Cleave claims that a person at the house, such as Stokes, may have already been pointing a weapon at the car at the time the gunfire from the car began. According to Sims, it seems unlikely that anyone from the house could have gotten off any gun-

shots in the time it takes for a car to pass a residence, unless a weapon was already in hand, ready to be fired.

In refusing to give Cleave's requested self-defense instruction, the trial court explained: "With respect to the self-defense instruction, the defense is, [']we were there but we didn't do anything['] and, therefore, there's no testimony that would justify a self-defense instruction, and I'll refuse to give it."

On appeal, Cleave claims that the question at issue was not how the trial court characterized the evidence, but how the jury might have characterized the evidence in light of a self-defense instruction, if given the opportunity.

In response, the State points out that "before a defendant is entitled to a self-defense instruction, relevant evidence must be presented that (1) the defendant honestly and sincerely believed it would be necessary to kill in self-defense and (2) a reasonable person would have perceived the necessity of self-defense." *State v. Sims*, 262 Kan. at 172 (citing *State v. Tyler*, 251 Kan. 616, 625, 840 P.2d 413 [1992]).

Cleave relies on the same evidence that Essex did to support his argument for a self-defense instruction: (1) a Glock pistol found inside the residence had fired at least two shots; (2) vehicles parked across the street from the Thomas home were hit by bullets; (3) a neighbor heard return fire from the house; and (4) the testimony of Lamont Sanders that he was a back seat passenger in the Sims car, and that he saw Carlton Stokes, one of the individuals outside the Thomas home at the time of the attack, aim a Glock pistol at the Sims car immediately before the shooting started. *State v. Sims*, 262 Kan. at 172.

In Essex's appeal, this court rejected his request for an instruction on self-defense because his theory of defense was that he did not participate in the shooting at all; not that he shot at the house in self-defense. For instance, at trial, Essex attempted to discredit witnesses who said they saw him holding a gun. Further, the primary defense witness, Sanders, denied knowledge of any guns in the Sims car or of any cars following behind their car. 262 Kan. at 172-73. In Essex's appeal, this court concluded that there was "absolutely no evidence proving the subjective component of self-de-

fense, that [Essex] Sims honestly believed he had to kill in self-defense." 262 Kan. at 173.

To qualify for an instruction on self-defense, there must be some evidence presented at trial that Cleave reasonably believed force was necessary to defend himself. See *Childers*, 222 Kan. at 48-49; *Hill*, 242 Kan. at 78. There was at least one State witness who admitted that she heard gunshots coming from the house. However, this witness testified that she did not hear gunshots from the house until after she heard gunshots coming from the passing cars. Thus, the testimony of this witness does not support a theory of self-defense on behalf of Cleave. One defense witness, Sanders, also testified that he saw Stokes point a gun at the car Cleave was driving. Sanders then dove down in the back seat of the car and heard gunshots for the first time. This evidence might have possibly supported a theory of self-defense, but the rest of Sanders' testimony discounts this theory. Sanders testified that he did not recall seeing a car behind Cleave's car as it drove down Fountain Street. Further, Sanders claimed that he was not aware of a Tec-9 gun in the car, even though the witnesses of the drive-by shooting testified that they saw Essex shooting a Tec-9 gun from a car driven by Cleave. Finally, there was no testimony from Sanders or anyone else that Essex or Cleave actually saw Stokes with a gun, or that Essex or Cleave might have seen Stokes, or ever could have seen him, from their vantage point in the car. Viewing the evidence in the light most favorable to the defendant, Cleave was not entitled to an instruction on self-defense. The trial court did not err in denying Cleave's request for a self-defense instruction. This issue fails.

## II. GANG AFFILIATION

On October 16, 1995, the prosecution filed a motion seeking permission to introduce evidence of gang affiliation and practice. The State argued in its motion: "Evidence of gang affiliation and practice in this case may provide motive for what is otherwise apparently a motiveless crime."

At the pretrial hearing, the State produced the testimony of Officer Kent Bauman, assigned to the Wichita Police Department

Gang Intelligence Unit. Bauman testified that the records of the unit disclosed that Essex had been identified in September 1992, more that 2½ years before the shooting, as a member of the Neighborhood Crips gang. He identified Cleave as an "associate" of the Neighborhood Crips. Bauman admitted during cross-examination that the only reason Cleave was listed as a gang "associate" was the fact he was arrested in this case with other gang members.

The prosecution concluded its evidence at the pretrial hearing by soliciting the following testimony from Bauman:

"Q. If signs were flashed in this case by one rival gang to another rival gang, would that be sufficient to precipitate a shooting incident?
"A. Yes, it would. Gangs take being disrespected very seriously.
"Q. Can the mere appearance or sight of a rival set be sufficient in and of itself just there, the mere presence of another set from one in your opinion as an expert in the area of street gangs sufficient to cause a shooting incident?
"A. Yes, it would be."

At trial, Angela Fair testified that she went to see her grandmother, Althea Thomas, at her grandmother's house on Fountain Street on the afternoon of March 22, 1995. Angela testified that while she was at her grandmother's house, she saw a girl in the front yard make what she described as a "gang sign." According to Angela, the sign consisted of the girl placing her thumb and forefinger together and raising the other three fingers in the air. Angela testified that the girl who made this gesture had been at the Fountain Street house for awhile that day, but she did not know who the girl was, nor could she see to whom, if anyone, the gesture was made.

Angela testified that later, while she was in the living room of her grandmother's house, she saw the back of a brown Monte Carlo a short distance beyond the driveway. She looked away and immediately heard shots. Angela said she had seen the same Monte Carlo before at Essex and Cleave's house and had seen them driving the car.

Al Smith also testified at trial that Althea Thomas is his grandmother, and he had been at her house in Wichita when a shooting incident took place there. Smith said he was looking out of the front door of the residence when he saw a brown Cutlass auto-

mobile containing two men pass by the house. After the car rolled past the house a short ways, Smith lost sight of the car and heard approximately 15 gunshots. At trial, Smith did not recall telling the police that he had seen "gang signs" displayed by anyone prior to the shooting.

Officer Bauman testified that he had questioned Smith regarding the shooting and Smith had told him that earlier on the day of the shooting a car had driven by and one of its occupants had flashed a "gang sign" at people in the yard at 1726 North Fountain. According to Bauman, Smith had said that the sign made from the car was "BK" for "Blood Killer." Bauman testified that Smith told him an unknown girl at the residence made a "B" for "Blood" sign back to the car.

Bauman also testified concerning gang affiliation and practices, as allowed by the court's pretrial order. Bauman defined a gang for the jury as "two or more people that join together and have common symbols, signs, mannerisms, and who individually or collectively commit crime." Bauman identified Essex as having been classified as a Neighborhood Crips gang member in September 1992. Bauman also gave the following testimony concerning Cleave:

"Q. Do you know Cleave Sims?

"A. Briefly, yes.

"Q. Okay.

"A. Not as well as I know his brother.

"Q. And, when you reviewed the records which you had with regard to Cleave Sims, what did they show?

"A. Before the time of this particular crime, we did not have Cleave listed as a gang member.

"Q. All right.

"A. But, during the investigation of this incident, we did list him as an associate.

"Q. All, right. And the reason for that was?

"A. That he was arrested for a gang-related drive-by shooting and arrested with other gang members.

"Q. In this case?

"A. *Yes, in this case.*" (Emphasis added.)

Bauman was permitted to offer his opinion that merely flashing a disrespectful sign at a member of another gang is sufficient prov-

ocation to cause a shooting and that this had happened "many times" in the past.

After Bauman's direct testimony, Judge Kennedy gave the jury the following instruction:

"Members of the jury, the evidence you've just received on gang affiliations has not been received and may not be considered by you as proof that any of the individuals named as gang members or running with gangs or associates of gangs are people of bad character or that they have any predisposition to commit crimes. This evidence has been received and may be considered by you only for the limited purpose or purposes of determining if it tends to show the existence or nonexistence of a *bias or interest* of any of the witnesses or to show a *motive* for this crime or these crimes. You must weigh this testimony and this evidence in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose." (Emphasis added.)

On appeal, Cleave challenges the admission of this evidence regarding gang affiliation. Cleave acknowledges that

"[e]vidence of gang affiliation indicating a defendant is a member of a gang or is involved in gang-related activity is admissible *to show a motive for an otherwise inexplicable act*. Such evidence, however, is only admissible where there is sufficient *proof* that such *membership* or activity is *related to the crime charged*." (Emphasis added.) *State v. Tran*, 252 Kan. 494, Syl. ¶ 6, 847 P.2d 680 (1993).

According to Cleave, this evidence of gang affiliation was not related to the crime charged, nor was it admitted to show a motive for the crimes charged. Thus, Cleave claims that evidence of his gang affiliation was improperly admitted into trial, thereby violating K.S.A. 60-455 and his constitutional right to a fair trial.

Essex's appeal also raised the issue that gang affiliation was improperly admitted at trial. In regard to Essex's issue, this court stated:

"[Essex] Sims did not object to the introduction of the gang evidence at trial. In fact, his attorney initiated the discussion of gang affiliations during his opening statement prior to the presentation of the State's case. We previously held in *State v. Cheeks*, 258 Kan. 581, 593, 908 P.2d 175 (1995):

'A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404 states that a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection. See *State v. Peckham*, 255 Kan. 310,

327, 875 P.2d 257 (1994); *State v. Johnson*, 255 Kan. 252, 254, 874 P.2d 623 (1994). By failing to make a contemporaneous objection at trial, the defendant failed to preserve this issue for appeal.'

"In *State v. Peckham*, 255 Kan. 310, 327, 875 P.2d 257 (1994), we reiterated that a party must still make a contemporaneous objection at trial even when an unfavorable ruling on an evidentiary question is received prior to trial.

"Nowhere does [Essex] Sims point out a contemporaneous objection to any of the gang evidence testimony he now claims was prejudicial. Furthermore, some of the complained-of testimony was elicited in response to questions during defense cross-examination. This issue has not properly been preserved for appeal.

"[Essex] Sims claims that we have unlimited de novo review over this issue as it infringes on his constitutional right to a fair trial, citing *Southwest Nat'l Bank of Wichita v. ATG Constr. Mgt., Inc.*, 241 Kan. 257, 265, 736 P.2d 894 (1987). This case provides absolutely no support for his proposition. Sims later refers to *Estelle v. Williams*, 425 U.S. 501, 503, 48 L. Ed. 2d 126, 96 S. Ct. 1691 (1976), to claim that the right to a fair trial in a criminal case is a fundamental liberty secured by the Fourteenth Amendment. However, as we pointed out in *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993), where the defendant argued he was deprived of his right to a fair trial by rulings preventing him from presenting his theory of defense, such a right is subject to statutory rules and case law interpretations of rules of evidence and procedure. Sims was bound by the requirement of a contemporaneous objection at trial, and the admission of this evidence cannot form grounds for a new trial.

"At oral argument, [Essex] Sims asserted the gang evidence was so prejudicial that we should disregard the contemporaneous objection requirement and examine the merits of the issue. Yet, it is clear that our standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. *State v. Haddock*, 257 Kan. 964, 978, 897 P.2d 152 (1995). 'Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view.' 257 Kan. at 978.

"[Officer] Bauman's testimony regarding gangs and gang affiliation helped explain the lack of apparent motive for this crime, regardless of the strength or weakness of the State's evidence of gang activity. As gang activity was the State's proposed motive for the drive-by shooting, such evidence was clearly relevant and related to the crimes charged. The evidence was therefore admissible under our prior holdings of *State v. Tran*, 252 Kan. 494, 505, 847 P.2d 680 (1993), and *State v. Toney*, 253 Kan. 651, 655, 862 P.2d 350 (1993), and its admission cannot be deemed an abuse of discretion. The evidence was properly admitted, received a proper limiting instruction, and was not the subject of a proper objection. This issue has no merit, even had it been properly preserved for appeal.

"[Essex] Sims also claims that the admission of the gang testimony violated K.S.A. 60-455, which bars the admission of evidence of other crimes or civil wrongs. This point was not raised below. We stated plainly in *State v. Ji*, 251 Kan. 3, 17, 832 P.2d 1176 (1992), that points not presented to the trial court may not

be raised on appeal. In addition, we held in *State v. Bailey*, 251 Kan. 156, 166, 834 P.2d 342 (1992), that membership alone in a gang is not a crime or civil wrong. The fact that Sims might have been a member of a gang was not evidence that he had committed other crimes, and the jury was so instructed. In addition to the failure to properly object or raise this issue below, a defendant presents no error in this issue requiring the grant of a new trial." 262 Kan. at 169-71.

Just like Essex, Cleave failed to timely object to the evidence regarding gang affiliation when it was presented at trial. Thus, this issue was not properly preserved for appeal. See *State v. Cheeks*, 258 Kan. 581, 593, 908 P.2d 175 (1995). This issue fails.

## III. MERGER

Cleave was convicted of felony murder based on a killing which occurred during the course of an underlying felony—criminal discharge of a firearm at an occupied dwelling. Cleave was also independently convicted of criminal discharge of a firearm at an occupied dwelling. Cleave claims that he was improperly convicted of felony murder based on this underlying felony, which he was independently convicted of, because the underlying felony of criminal discharge of a firearm at an occupied dwelling merges into the charge of felony murder.

Essex also raised this issue in his appeal to this court. 262 Kan. at 171-72. Essex's appeal was unsuccessful. In so holding, this court stated:

"*Felony murder does not merge with the underlying conviction of criminal discharge of a firearm.*

"Again, this issue was not raised to the trial court. As such, it is not properly before us on appeal. However, an identical argument was made on appeal in *State v. Alderson*, 260 Kan. 445, 459, 922 P.2d 435 (1996), where we pointed out that the legislature determined that criminal discharge of a firearm, K.S.A. 21-4219, does not merge with homicide, citing K.S.A. 21-3436(a)(15).

"Sims contends that our ability to reverse a case if a jury instruction was clearly erroneous, despite the failure to object, equally applies if a charge was not valid, as the jury would have been erroneously instructed on the crimes for which it could convict. This validity of a charge argument is not analogous to a clearly erroneous instruction argument. Additionally, Sims goes on to claim that despite the failure to raise the issue below, we lack jurisdiction to sustain a conviction based on an unconstitutional construction of the felony-murder statute. This contention is incorrect, as Sims offers no support for finding the statute to be uncon-

stitutional. Instead, he reiterates case law on the merger doctrine decided prior to the enactment of the statute at issue.

"This statute, K.S.A. 21-3436, clearly states that the two crimes of felony murder and criminal discharge of a firearm do not merge and provides:

'(a) Any of the following felonies shall be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 and amendments thereto as not to be an ingredient of the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 and amendments thereto:

. . . .

(15) any felony offense as provided in K.S.A. 21-4219 and amendments thereto.' K.S.A. 21-4219 sets forth the crimes involving criminal discharge of a firearm.

"We find that *Alderson* is exactly on point and clearly correct. Under the cited Kansas statutes and the *Alderson* decision, the two crimes do not merge and this point fails." 262 Kan. at 171-72.

Cleave acknowledges that Essex has previously raised this issue on appeal to this court without success. However, Cleave claims that he is asserting this issue again on appeal because he believes that this court's ruling in Essex's appeal was in error. Cleave asks this court to reconsider its ruling in Essex's appeal and grant him relief under this issue. We decline to do so.

Cleave raises the *exact* arguments which Essex raised in his appeal. The opinion regarding Essex's appeal is well reasoned. This court's ruling in that appeal was not in error. This issue fails.

## IV. DOUBLE JEOPARDY

The trial court sentenced Cleave to life in prison for his felony-murder conviction. The trial court also sentenced Cleave to 13 months in prison for his conviction of criminal discharge of a firearm at an occupied dwelling, with the sentence to run consecutive to his life sentence. Finally, the trial court sentenced Cleave to 47 months in prison for each of the aggravated battery convictions, with these two sentences to run concurrent with each other but consecutive to the sentences for the other counts. The trial court imposed a total controlling sentence of life in prison plus a consecutive 60 months.

On appeal, Cleave claims that his consecutive sentences for criminal discharge of a firearm at an occupied dwelling and his sentence for felony murder violate his constitutional protections

against double jeopardy. Essex was also sentenced to consecutive sentences for these crimes, and he raised this same issue in his appeal to this court. Essex's appeal was unsuccessful. In so holding, this court stated:

> "*Consecutive sentences for felony murder and criminal discharge of a firearm do not violate double jeopardy.*
>
> "Sims also raises this point for the first time on appeal. We said in *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993), that constitutional grounds asserted for the first time on appeal are not properly before the appellate court to review.
>
> "Additionally, this issue has no merit as we have stated numerous times that where the same act or transaction violates two distinctly different statutory provisions, the test to be applied to determine if there are one or two crimes is whether each statute requires proof of an element the other crime does not. Where one statute requires proof of an additional or different element, the crimes are not the same, even though the proof of the crimes may substantially overlap. See *State v. Dunn*, 243 Kan. 414, 432-33, 758 P.2d 718 (1988).
>
> "Pursuant to K.S.A. 21-3436, a large number of underlying felonies may support a felony murder charge. It is well-established law in Kansas that multiple convictions and punishments for both felony murder and the underlying felony do not violate double jeopardy. In *State v. Holt*, 260 Kan. 33, 46, 917 P.2d 1332 (1996), we cited a long list of cases where we have upheld separate convictions for both. This issue was not only improperly raised, but is also without any merit." 262 Kan. at 173.

Cleave acknowledges that Essex previously raised this issue on appeal to this court without success. However, Cleave claims that he is asserting this issue again on appeal, because he believes that this court's ruling in Essex's appeal was in error. Cleave asks this court to reconsider its ruling in Essex's appeal and grant him relief under this issue. We decline to do so.

Just as in Essex's case, this double jeopardy issue was not raised to the trial court and is not properly before this court on appeal. See *Sims*, 262 Kan. at 173 (citing *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 [1993]). As such, this issue fails.

Affirmed.