NOT DESIGNATED FOR PUBLICATION

No. 128,025

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

JEFFERY ROBERT ELAM,
*Appellant.*

MEMORANDUM OPINION

Appeal from Sedgwick District Court; CHRISTOPHER MAGANA, judge. Submitted without oral argument. Opinion filed March 20, 2026. Conviction affirmed, sentence vacated in part, and case remanded with directions.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

*Stephanie B. Poyer*, of Butler & Associates, P.A., of Topeka, amicus curiae.

Before ARNOLD-BURGER, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: While walking to her car after being out with some friends, A.H. was stabbed, causing an injury to her liver. A jury later convicted Jeffery Robert Elam of attempted second-degree murder. Elam now timely appeals his conviction and sentence, asserting multiple trial errors, and further arguing K.S.A. 2021 Supp. 21-6604(b)(3) is unconstitutional. He also claims that, with the recent change in the law, he is entitled to additional days of jail credit. After review, we find no trial errors and affirm his

1

conviction. We decline to review his unpreserved claim regarding the constitutionality of K.S.A. 2021 Supp. 21-6604(b)(3). However, we find Elam is entitled to additional jail credit; thus, we vacate his sentence in part and remand for the district court to calculate and award Elam the proper jail credit toward his sentence.

FACTUAL AND PROCEDURAL BACKGROUND

On the night of November 20, 2021, A.H. went out for drinks with her coworkers in Wichita's "Old Town" after work. She eventually decided to go home and walked back to her car alone. A.H. had been walking for six or seven minutes when she noticed a man—later identified as Elam—across the street from her. Elam caught her attention because he was "walking quickly and with purpose." A.H. started walking faster to her car because she "felt some alarm bells going off." She noticed Elam increased his own pace and eventually crossed to her side of the street. Elam had one hand in the pocket of his hoodie, which led A.H. to believe he was carrying a weapon. When A.H. saw Elam cross toward her, she started running to her car. She made it to the driver's door but did not have her keys out. At that time, Elam was near the trunk of the car on the driver's side. A.H. said, "No," and ran toward a nearby establishment.

A.H. made it halfway across the street but stumbled as she ran. Elam grabbed A.H. from behind, stabbed her twice in the abdomen, and ran away. A.H. put pressure on the wound, ran, and screamed for help. First responders treated A.H. at the scene, then she was taken to a local hospital, undergoing emergency surgery to repair her liver.

The State charged Elam with attempted second-degree murder in violation of K.S.A. 2021 Supp. 21-5301(a) and K.S.A. 2021 Supp. 21-5403(a)(1). The State later added an alternative count of aggravated battery in violation of K.S.A. 2021 Supp. 21-5413(b)(1)(A). In April 2024, this matter proceeded to a jury trial.

A.H. testified she had no altercations at work or after work with any customers or coworkers on the day of the incident. A.H. said she had difficulties with her health and pain following the stabbing incident. A.H. never got a good look at her attacker because his face was covered with a medical-type mask. She recalled he wore a light gray hoodie and jeans. A.H. testified the assailant never said anything to her. When asked if she recognized or knew Elam, who was in the courtroom, A.H. testified she did not.

A witness testified he was in a nearby parking lot when he heard a terrified scream. He ran toward the noise and saw A.H. He helped A.H. get to a nearby establishment then tried to find A.H.'s attacker. He saw a man exiting an alleyway, wiping something off in his hand with a rag or cloth. He yelled at the man and asked if he had just stabbed someone. The man glanced at the witness and ran away. The witness pursued the man but got winded and stopped. The witness showed law enforcement where the man had dropped some items and described the man as six feet tall with a slender build and short hair. The witness testified he believed the man had on a face covering and was wearing jeans and a dark shirt.

A security guard from a nearby establishment was also outside and saw a person running. The person dropped something cloth-like before removing and dropping two items of clothing. When the security guard got back to the establishment, he learned about the stabbing and assisted A.H. in getting inside. The security guard described the person as a "smaller individual" with olive skin and dark hair, although he was uncertain about the hair color. The security guard testified the witness who claimed to have chased the assailant looked very different from the person he saw running.

Monica Yourgal, a crime scene investigator, testified about items she collected at the scene, including a voucher card from Goodwill, which she tested for fingerprints. Yourgal testified there was security footage from the area, which showed a person

3

wearing certain clothing in some of the footage and then other clothing in other parts of the footage. This prompted officers to look for the missing clothing items.

Detective Anthony Klumpp of the Wichita Police Department testified about obtaining video from three cameras at Norton's—an area bar—and their locations at that property. Wichita Police Department Sergeant Chad Cooper testified about the security camera footage law enforcement secured from different establishments and residential sites in the area. Cooper said officers tried to get video footage in the area north of Norton's based on the witness' testimony that he pursued the alleged assailant in that direction. However, Cooper believed the officers did not attempt to obtain video from locations south, east, or west of Norton's. Cooper testified he took two screenshots from one establishment's footage and shared them with another officer, Alex Gregerson, who worked part-time as private security at the Lord's Diner, a nearby eatery.

Gregerson testified he was working at Lord's Diner when he received a still image of the suspect from Cooper and was asked to look for anyone who matched the image. The person in the image had dark hair and was wearing blue plaid pajama-style pants. Gregerson observed a man standing on the patio walkway outside the Lord's Diner who matched the physical characteristics and was wearing the same or similar clothing as the man in the image. Gregerson notified another officer—Cody McCall—that the suspect was on-site. After confirming Elam's identity, the officers learned Elam had an existing warrant for his arrest. Gregerson and McCall approached Elam, grabbed his wrists, and conducted a pat-down to ensure their safety, given he was a suspect in a stabbing. During their search, the officers found a sheathed knife affixed to Elam's waistband. The officers took photographs for later comparison with surveillance footage.

Wichita Police Officer Holly Cash testified about the chain of custody regarding Elam's knife and the pajama pants he was wearing at the time of his arrest. Cash testified the pajama pants had blood on them. Wichita Police Department crime scene investigator

Crystal Chitwood swabbed the knife for blood, which came back positive. Therese Gibler, a forensic scientist with the Sedgwick County Regional Forensic Science Center, testified that both A.H. and Elam submitted DNA samples to be tested against the blood that was detected on the knife and on some of the clothing recovered along the route taken by A.H.'s attacker. Elam could not be excluded as a DNA source to samples taken from the hat, gloves, and sweatshirt found by officers. Elam and A.H. could not be excluded as major contributors for the DNA profiles found on the knife, although Gibler testified the swabs with A.H.'s match came from law enforcement, while her own swab excluded A.H. She confirmed A.H.'s DNA was excluded from the gloves and sweatshirt.

Cooper testified about the Goodwill receipt found in an article of clothing collected as part of law enforcement's investigation and his interaction with the director of risk management from Goodwill. The director of risk management at Goodwill testified about the voucher program Goodwill offers, which allows people to get a voucher for items they cannot afford. He confirmed the voucher was used for the items purchased and detailed on the Goodwill receipt, and that specific voucher had been issued to Elam. He located security video of the transactions, which he gave to law enforcement.

Klumpp testified there were two videos from Goodwill, both dated from November 19, 2021, but occurring at different times. The first video showed a man wearing a white or light gray sweatshirt and blue pants buying a black jacket, black hat, and white tennis shoes, which were consistent with the clothing items subsequently retrieved by officers. Klumpp believed Elam was the person in the Goodwill videos.

At the end of the State's case-in-chief, Elam moved for a judgment of acquittal on the attempted second-degree murder charge. The district court denied the motion. Elam then testified in his own defense. Elam was homeless at the time of the incident. He admitted he was the person in the Goodwill security video and he purchased the clothes the officers discussed in their testimony. Elam testified he left El Dorado on the evening

5

of November 19, 2021. He walked to Wichita and arrived around 5 p.m. on November 20, 2021. Elam said he was given red pajama pants from the Lord's Diner staff while his acquaintance, Angel, received blue pajamas.

Elam testified he and his acquaintances were told food was being served at another location, so they left the Lord's Diner to go eat at the other location. He claimed he later changed clothes at a gas station on the way back to the Lord's Diner. Elam testified he was with Angel, another person named Ant, and two of Angel's friends whose names he did not mention. They returned to the Lord's Diner at around 7 p.m., and he slept for 10 to 12 hours. Elam denied encountering A.H. or being in the area where she was attacked. He further denied he was the person seen attacking A.H. in the security video.

When he awoke on November 21, 2021, Elam's acquaintances were gone, as was his trash bag full of medication and dirty clothes. Angel and Ant returned later that day, and Ant did not know where Elam's bag had gone. Elam said Angel agreed to swap pajama pants, giving Elam the blue pants while Angel took Elam's red pants. Angel also gave Elam a knife to cut branches for a fire and told Elam he could keep the knife. Angel was not there when Elam returned to the Lord's Diner around 3 or 4 p.m. on November 22, 2021. Elam did not see Angel again. Elam rested his defense.

At the close of the evidence, the district court denied Elam's renewed motion for a judgment of acquittal. The jury convicted Elam of attempted second-degree murder and aggravated battery. Prior to sentencing, Elam filed another motion for judgment of acquittal, a motion for new trial, and a motion for dispositional and durational departure. The district court denied all three motions. It sentenced Elam to 228 months' imprisonment for attempted second-degree murder, with 36 months' postrelease supervision, and ordered his sentence run consecutive to any sentences in other cases. The journal entry of sentencing reflects Elam was only sentenced for attempted second-degree murder.

The State asked for $17,167.67 in restitution for A.H.'s medical expenses. The district court ordered restitution as requested by the State. The district court then asked about the jail credit calculation. The State explained Elam was taken into custody on November 23, 2021, but that he was picked up on a parole hold at that time. The State did not file charges in this case until December 2, 2021. The district court said:

> "Typically, DOC has a pretty good record of when someone's back in their custody on a postrelease supervision hold. So I'm assuming they're going to know how to apply that credit. But if there is any issues or discrepancies, then DOC is fond of notifying us. And then there is also postsentencing means to address jail credit errors or corrections, if necessary.
>
> "So we've got a rough idea, after 147 days, give or take, without the parole hold, and then I guess the DOC can determine how much of that, if any, is going to his parole case."

Additional facts are set forth as necessary.

## ANALYSIS

I.  *Sufficient Evidence Supported Elam's Attempted Second-Degree Murder Conviction*

Elam first argues there was insufficient evidence to prove attempted second-degree murder. Specifically, he asserts there was no evidence he intended to kill A.H.

*Standard of Review*

> "When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh

7

evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

"It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

*Discussion*

For the jury to convict Elam of attempted second-degree murder, the State was required to prove beyond a reasonable doubt that Elam intended to kill A.H. but failed in doing so. Elam argues the State did not prove he intended to kill A.H., claiming the stabbing "at most, [was] a case of aggravated battery." He "concedes that jurors may . . . infer intent to kill through the nature of an act that causes injury or death" but maintains such an inference "must be supported by something more than mere suspicion."

Intent to kill is a factual question for the jury. The jury may rely on "'acts, circumstances, and inferences'" to determine intent. *State v. Buchanan*, 317 Kan. 443, 454-55, 531 P.3d 1198 (2023). Here, Elam's actions, the circumstances in which they occurred, and reasonable inferences from the same support the jury's verdict. The jury saw surveillance footage which showed Elam pacing the area before he encountered A.H., who was walking alone. Elam followed and kept pace with A.H., chased A.H. to her car, then continued chasing her across the street before stabbing her twice in the abdomen. Stabbing is an overt act in an attempted killing. *State v. Wilson*, 30 Kan. App. 2d 498, 500, 43 P.3d 851 (2002). The jury, using its common knowledge and experience, could easily recognize that stabbing someone in the abdomen—a place with several vital organs—can result in death. And the jury was presented evidence of A.H.'s injuries, which required emergency surgery to repair her liver.

8

Viewing the evidence in the light most favorable to the State, the jury could conclude Elam intended to kill A.H. To find otherwise would require us to reweigh the evidence, which we cannot do. *Mendez*, 319 Kan. at 723.

II. *The District Court Did Not Abuse Its Discretion by Refusing to Discharge the Jury Panel*

Elam argues the entire jury panel was tainted by comments made by a potential juror during voir dire and the district court abused its discretion when it failed to discharge the panel after those comments. His briefing of the issue is confusing insofar as he appears to argue the district court should have recognized his objection to the comments as a request for a mistrial. The jury selection process was also raised in his motion for new trial, although he does not specifically challenge the denial of that motion in this appeal. In any event, a district court's decision to declare a mistrial, denial of a motion for new trial, and handling of issues involving juror conduct are all reviewed for an abuse of discretion. See *State v. Davidson*, 315 Kan. 725, 728, 510 P.3d 701 (2022) (motion for new trial); *State v. Fraire*, 312 Kan. 786, 789, 481 P.3d 129 (2021) (motion for mistrial); *State v. Moore*, 302 Kan. 685, 692-93, 357 P.3d 275 (2015) (mistrial for juror misconduct). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025).

*Supplemental Facts*

On the first day of jury selection, the district court asked if any of the potential jurors knew Elam. One potential juror responded, "Not personally, but I work for the sheriff's office, and I believe I know of him." The following dialogue then occurred:

"THE COURT: What did you do for the sheriff?

"PROSPECTIVE JUROR []: I work in the detention facility. I'm a lieutenant, and I'm over special projects, and I supervise a team called the flex team. I believe I've had dealings with him.

"THE COURT: Okay. You're currently employed there?

"PROSPECTIVE JUROR []: Yes."

Defense counsel had an off-the-record discussion with the district court, then the court excused the potential juror. Later, outside the jury's presence, defense counsel expressed concern that the potential juror's statements may have tainted the entire venire. The State responded that, because the questioning did not continue and because the jury would learn—or even expect—that Elam was placed under arrest at some point, the statements would not have tainted the panel. The district court believed the panel was not tainted, noting the jury could infer from the presence of uniformed officers in the courtroom that Elam was in custody and, based on the nature of the allegations, the jury could reasonably conclude Elam had been in custody on the present charges.

*Discussion*

Elam argues the potential juror's statements "affronted [his] constitutional right to the presumption of innocence" and resulted in a tainted jury panel. He relies on K.S.A. 22-3423(1)(c), which permits the trial court to order a mistrial based on "prejudicial conduct, in or outside the courtroom, [which] makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." Elam argues the statements could have been interpreted by other jurors as meaning he was held in pretrial custody, which violated his right to a presumption of innocence, or that he had been

10

previously incarcerated on other charges or convictions, which may have undermined his right to the exclusion of prior bad acts evidence under K.S.A. 60-455. We disagree.

Here, neither of the parties nor the district court made any additional inquiry about how the potential juror knew Elam apart from his initial statement. There was no discussion of Elam's other convictions or charges. And Elam did not request to examine the jury for prejudice. It is also reasonable to presume jurors understand suspects in violent crimes are often arrested and detained, at least for some period. Here, the jury could easily interpret the complained-of statements as relating to an arrest on the present charges. At trial, the jury even saw video of Elam being arrested, indicating he was, in fact, taken into custody. We conclude the jury's limited knowledge of Elam's incarceration relating to his pending charges did not impact his right to the presumption of innocence. This is especially true when, as occurred here, the jury is repeatedly informed of the defendant's right to be presumed innocent. The district court did not abuse its discretion.

III.     *The Prosecution Committed One Error During Its Closing Argument, but the Error Was Harmless*

Elam argues he was denied a fair trial when the prosecution made statements that the State and the jury "knew" Elam was guilty.

*Supplemental Facts*

During closing argument, the prosecution opened by saying: "Ladies and gentlemen, on November 21st, 2021, the defendant stabbed [A.H.]. You now have the evidence, and you now know that that is what happened." The prosecutor then said: "So I want to talk a little bit about who committed the crime. And, ladies and gentlemen, the evidence shows you that the defendant is the person who did this." The prosecutor

11

reviewed all the evidence presented in the case and then said, "So from all of this evidence, you know the defendant is the person who stabbed [A.H.] in that video."

On rebuttal, the prosecution began by saying, "Ladies and gentlemen, nobody is asking you to convict the wrong person here. You have the evidence in front of you that the defendant committed this crime." The prosecution then closed by saying:

"Why do we think the knife is what did it? Well, because the defendant stabbed her. The defendant had the knife. You have the knife with the DNA on it. You can consider circumstantial evidence, and I'm asking you to do that.

"Ladies and gentlemen, you have all the evidence you need to show you the defendant is the person who committed these crimes. You have the evidence to show you that he went up there, and he was attempting to kill her that day. We may not know why, but we know what he did. Why else do you stab someone in the abdomen multiple times, or at least attempt to? Why else do you do that? What other intent would you have?

"You have what you need to find him guilty."

*Standard of Review*

We use a two-step process to evaluate claims of prosecutorial error:

"'To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)].'" *Mendez*, 319 Kan. at 737.

A prosecutor's error is harmless if the State shows "there is no reasonable possibility that the error contributed to the verdict." *State v. Ninh*, 320 Kan. 477, 495, 570 P.3d 1169 (2025).

*Preservation*

Elam concedes he did not raise this issue before the district court. However, appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during a closing argument even without a timely objection, but the court may consider the presence or absence of an objection in its analysis of the alleged error. *Mendez*, 319 Kan. at 737.

*Discussion*

We begin our analysis by determining whether the prosecutor's remarks "were outside the wide latitude allowed in discussing the evidence." 319 Kan. at 738. In doing so, we must consider the entire context in which the prosecutor's remarks were made. 319 Kan. at 738.

Elam argues the following emphasized language violated the presumption of his innocence and injected the prosecutor's opinion:

- "Ladies and gentlemen, on November 21st, 2021, the defendant stabbed [A.H.]. You now have the evidence, and *you now know that that is what happened.*"
- "So from all of this evidence, *you know the defendant is the person who stabbed [A.H.]* in that video."

13

- "You have the evidence to show you that he went up there, and *he was attempting to kill her that day. We may not know why, but we know what he did*."

Elam concedes the prosecution "could have properly argued that trial evidence showed that [Elam] was the person who had stabbed [A.H.]." However, he asserts the prosecutor's arguments went further than what is permitted by telling jurors they "already" knew of Elam's guilt. We largely disagree. The overall context of the prosecutor's statements were in reference to the evidence presented at trial. At worst, we observe some inartful wording by the prosecutor, but the general point of the prosecutor's arguments was appropriate.

In *State v. Bobian*, 321 Kan. 169, 574 P.3d 385 (2025), our Supreme Court considered a challenge to the prosecution's use of "'we know'" and "'you know'" statements during closing arguments. The *Bobian* court found no error in the prosecutor's "'you know'" statements and clarified that "'you know'" statements are not synonymous with "'we know'" statements. 321 Kan. at 183. The court added that a prosecutor may use the phrase "'we know'" if the phrase is used to convey that the evidence was uncontroverted rather than the prosecutor's own opinion. 321 Kan. at 182-83.

Here, two of the challenged statements involved "you know" phrasing, and both statements were made by the prosecutor during closing argument in reference to the evidence before the jury. These statements did not undermine the *presumption* of innocence. Rather, the prosecutor was making a common-sense argument that the State had proven its case *based on the evidence*. As in *Bobian*, these statements do not constitute error.

The State concedes the prosecutor's "we know" statement was erroneous. The defense's theory was that another person stabbed A.H., making identity the primary issue

14

at trial. The prosecutor saying "we know what he did" was error because the evidence was not uncontroverted. See *Bobian*, 321 Kan. at 182-83. Accordingly, we must determine whether this statement was harmless, i.e., whether there is a "reasonable possibility that the error contributed to the verdict." *Ninh*, 320 Kan. at 495.

Here, the statement was a single remark made at the end of rebuttal in closing. As the State points out, the jury saw a video of the attack as well as video of the attacker before and after the crime. The jury also saw video of Elam at the Goodwill store, and Elam admitted he was in the video. Thus, the jurors had the opportunity to consider the video evidence and compare the individual(s) seen in the videos, and they ultimately concluded Elam was the attacker. Further, the State presented DNA evidence reflecting A.H.'s DNA was on the knife found on Elam's person as well as Elam's DNA on the clothing discarded by the attacker. Finally, the jury was free to consider Elam's theory of defense that some other dude did it, his clothes were stolen, Angel and Elam traded pants the day following the stabbing, and Elam was given the knife by Angel the day after the knife was used to stab A.H. The district court instructed the jury it was free to make its own credibility determinations and to disregard any statements by the parties that were not supported by the evidence. The evidence supports Elam was the person who stabbed A.H. We find the prosecutor could have rephrased the closing arguments, but, in the overall context of the record before us, the one error was harmless.

We decline to address the State's additional argument about who should bear the burden to prove a prosecutor's error was harmless, as it is unnecessary to our decision. Recently, our Supreme Court reaffirmed its position that the State bears the burden to prove harmlessness, regardless of whether an objection is made during trial. *Bobian*, 321 Kan. at 182. Moreover, we are bound by Supreme Court precedent absent some indication our Supreme Court intends to depart from its prior position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022).

IV.   *Elam's Suppression Motion Was Correctly Denied*

Elam argues the district court erred in denying his suppression motion regarding evidence of the knife.

*Supplemental Facts*

Prior to trial, Elam moved to suppress evidence obtained from the search of his person, arguing the officers lacked reasonable suspicion to conduct the search. At the suppression hearing, Gregerson testified consistent with his trial testimony. He was working security for the Lord's Diner on November 22, 2021; received a call from Cooper about the stabbing; and received pictures of the suspect. Gregerson reviewed the photographs and then saw Elam, who appeared to match the person in the photographs. Gregerson and another officer approached Elam and were concerned for officer safety. The officers believed Elam was a possible suspect in the stabbing and potentially armed and dangerous. After confirming Elam's identity through "mug photos" and conducting a records check, the officers learned Elam had an existing warrant for his arrest. Based on the warrant, the officers took Elam into custody and then conducted a search of Elam's person incident to arrest, wherein the officers found the knife.

The district court denied Elam's motion, finding the initial investigative detention was proper because the officers had reasonable suspicion to believe Elam was involved in the stabbing. The district court further found the warrant justified Elam's arrest and, in turn, the subsequent search wherein officers found the knife.

*Standard of Review*

We review the district court's factual findings on a motion to suppress to determine whether they are supported by substantial competent evidence. When

16

considering the factual findings made by the district court, we do not reweigh evidence or determine credibility. *State v. Garrett*, 319 Kan. 465, 469, 555 P.3d at 1116 (2024). When the material facts underlying the district court's decision are not in dispute, the district court's ultimate decision on whether to suppress the evidence is a question of law subject to unlimited review. *Mendez*, 319 Kan. at 735-36.

*Discussion*

Elam argues the officers lacked reasonable suspicion to detain him. Accordingly, he asserts the subsequent search of his person was improper. However, Elam fails to challenge the district court's alternative basis for its decision—the discovery of an active warrant justified Elam's arrest; therefore, the knife was lawfully discovered during a search incident to a valid arrest. Effectively, the district court was referring to the application of the attenuation doctrine based on the discovery of the warrant. Thus, even assuming the initial seizure was unlawful, the discovery of the warrant prior to Elam's arrest would still save the fruits of the search incident to arrest. See *State v. Ellis*, 311 Kan. 925, 936, 469 P.3d 65 (2020).

When a district court provides alternative bases to support its ultimate ruling on an issue, and an appellant—here, Elam—fails to challenge the validity of both alternative bases on appeal, we may decline to address his challenge to the district court's ruling. *Ellie v. State*, 312 Kan. 835, 840, 481 P.3d 1208 (2021). We exercise our discretion and decline to address Elam's challenge to the denial of his suppression motion. The knife was found *after* the officers discovered the arrest warrant and arrested Elam based on the warrant. We will not render a decision on the propriety of law enforcement's actions pursuant to "'a judicial mandate to . . . make an arrest'" where Elam has made no argument regarding the same. See *Utah v. Strieff*, 579 U.S. 232, 240, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016).

17

V. *No Cumulative Error*

Elam argues cumulative errors deprived him of his right to a fair trial.

"The cumulative error rule does not apply if there are no errors or only a single error." *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

There are no cumulative errors to consider in this case. The only error we have found is the prosecutor's "'we know'" statement, which was harmless. A single harmless error does not constitute reversible cumulative error.

VI. *We Decline to Address Elam's Challenge to K.S.A. 2021 Supp. 21-6604(b)(3)*

Elam argues K.S.A. 2021 Supp. 21-6604(b)(3)—the statute under which he was ordered to pay restitution—is unconstitutional. He asserts the 2022 amendments to K.S.A. 21-6604(b) did not fix the constitutional defects identified by the Kansas Supreme Court in *State v. Arnett*, 314 Kan. 183, 194, 496 P.3d 928 (2021) (order of criminal restitution cannot be converted to civil judgment). The constitutionality of a statute "is a question of law subject to unlimited review." 314 Kan. at 188.

Elam concedes he is raising this issue for the first time on appeal. Constitutional issues are generally not considered when raised for the first time on appeal. Moreover, "our review is prudential, and even if an exception may apply, we may still decline to review the question." *Mendez*, 319 Kan. at 730. We exercise our discretion and decline to review this issue.

18

VII. *The District Court Correctly Resolved Elam's Aggravated Battery Conviction*

Elam argues the district court erred in failing to dismiss his conviction for aggravated battery. He asserts the district court instead held that conviction in abeyance. However, he concedes he did not raise this issue before the district court. Issues not raised before the district court generally will not be considered for the first time on appeal. *Mendez*, 319 Kan. at 730. But Elam argues this claim concerns the district court's jurisdiction and we must resolve jurisdictional claims raised for the first time on appeal. He likens the district court's exercise of its power to its jurisdiction, asserting "district courts have no 'power'—i.e., jurisdiction—to hold a conviction in abeyance." We disagree. The district court's authority to hear a case—i.e., subject matter jurisdiction—is distinct from its exercise of authority within that case. See *In re Estate of Pritchard*, 37 Kan. App. 2d 260, 270, 154 P.3d 24 (2007) ("Subject matter jurisdiction is the power to decide and not the exercise of that power.").

We exercise our discretion and decline to review this issue because it does not present a jurisdictional question. See *State v. Sims*, 265 Kan. 166, 178, 960 P.2d 1271 (1998) (double jeopardy claim raised for first time on appeal not properly before the court); *State v. Ralston*, 43 Kan. App. 2d 353, 368, 225 P.3d 741 (2010) (multiplicity claim raised for first time on appeal not properly before the court); see also *Mendez*, 319 Kan. at 730 ("[O]ur review is prudential, and . . . we may still decline to review the question.").

VIII. *The District Court Cannot Assign the Assessment of Jail Credit to the Kansas Department of Corrections*

Elam seeks a remand for a nunc pro tunc order to obtain the amount of jail credit he is owed in this case.

19

*Supplemental Facts*

At sentencing, the State informed the district court that both parties agreed on the time during which Elam was held in custody, although the State wanted the credit for the time when Elam "was picked up on his parole hold" applied to his parole case. Elam responded:

> "I think if the journal entry reflects that he was taken into custody on November 23rd of '21, you know, they've done that before where they have shown that he was being held on a different case. I think as long as the journal entry reflects that, KDOC will be able to make the proper determinations. But this case here was filed on 12/2 of '21."

The district court agreed, instructing Elam's counsel to "draft a journal entry in that regard" and then stating that the court would "assum[e] [KDOC is] going to know how to apply that credit." The district court further stated: "So we've got a rough idea, after 147 days, give or take, without the parole hold, and then I guess the DOC can determine how much of that, if any, is going to his parole case."

*Standard of Review*

This issue requires us to interpret the jail credit provisions set forth in K.S.A. 21-6615. "[S]tatutory interpretation is a question of law over which we have unlimited review." *State v. Daniels*, 319 Kan. 340, 342, 554 P.3d 629 (2024). In interpreting statutes, we attempt to determine the intent of the Legislature. *John Doe v. M.J.*, 315 Kan. 310, 320, 508 P.3d 368 (2022). When a statute "'is plain and unambiguous,'" we analyze the statute by "'giving common words their ordinary meanings, without adding to or subtracting from the text.'" *State v. Ervin*, 320 Kan. 287, 306-07, 566 P.3d 481 (2025). Only when the statute is ambiguous do we turn to other construction tools to ascertain legislative intent. *State v. Betts*, 316 Kan. 191, 198, 514 P.3d 341 (2022).

*Preservation*

Elam admits he did not raise this issue before the district court. "[I]ssues not raised in the district court generally will not be considered on appeal." *Ervin*, 320 Kan. at 306. Elam maintains K.S.A. 22-3504 permits us to fix the error in his sentence. However, Kansas "caselaw has not definitively settled whether jail-credit challenges fall within the illegal-sentence statute." *State v. Romey*, 321 Kan. 400, 419, 580 P.3d 1 (2025). Elam also argues an exception exists to the general rule that an issue raised for the first time on appeal will not be considered. Specifically, Elam argues his claim presents a purely legal issue. While this may be true, it does not require our review. See *Mendez*, 319 Kan. at 730.

In *State v. Brown*, 65 Kan. App. 2d 663, 570 P.3d 1278 (Kan. App.), *rev. denied* 321 Kan. ___ (September 9, 2025), another panel of our court considered a defendant's challenge to the award of jail credit despite the fact she did not raise the issue before the district court. The *Brown* panel found the defendant "had no chance to do so since the [district] court did not address jail time credit in court during her probation revocation hearing." 65 Kan. App. 2d at 670. Here, the record shows Elam had an opportunity to raise this issue before the district court, but he did not. Still, we note the ongoing uncertainty of "whether jail-credit challenges fall within the illegal-sentence statute." *Romey*, 321 Kan. at 419. Out of an abundance of caution, we deem it prudent to review this unpreserved claim to avoid the possibility of Elam serving a potentially illegal sentence.

*Discussion*

Relying on *Ervin*, Elam argues that the portion of the journal entry that seems to limit how his jail credit is to be applied is invalid and must be corrected. He does not

21

challenge the amount of jail credit the court awarded to him. The portion of the journal entry at issue says:

> "Note: The defendant was booked in on 11/22/21 on KDOC Parole Violation warrant and City of Wichita cases 19DV3521 and 21DR1953; however, the defendant was not booked on this case until 12/02/21.
>
> "From 11/22/21 to 07/01/24, defendant also held on a KDOC Parole Violation warrant in 13CR973 and 13CR1046. If defendant receives credit for these dates in case 13CR973 and 13CR1046, then defendant is not eligible for duplicate credit in 21CR2447. [Special Rule 9]"

Elam's conviction resulted from acts committed in November 2021. Accordingly, K.S.A. 2021 Supp. 21-6615 controls the jail credit Elam is entitled to receive. See *State v. Juiliano*, 315 Kan. 76, 80, 504 P.3d 399 (2022) ("The court sentences a person convicted of a crime in accordance with the sentencing provisions in effect when the person committed the crime."). We are unpersuaded by the State's arguments that the 2024 amendments to K.S.A. 21-6615 apply retroactively.

Another panel of our court recently considered a similar argument and concluded that "the legislature provided no indication that it intended the amended jail-credit statute to apply retroactively in any respect." *State v. Mitchell*, 66 Kan. App. 2d 196, 204, 579 P.3d 970 (Kan. App. 2025), *rev. granted* 321 Kan. ___ (February 24, 2026); see *State v. Ford*, 262 Kan. 206, 208, 936 P.2d 255 (1997) ("It is a fundamental rule of statutory construction that a statute operates prospectively unless its language clearly indicates that the legislature intended it to operate retroactively."). We follow the same reasoning here. The *Mitchell* panel provided a thorough and well-reasoned explanation of the legislative intent reflected in the 2024 amendments, and we need not repeat it. 66 Kan. App. 2d at 205-07.

As in *Ervin*, the district court here "[must] award one day of credit for each day that [Elam] was incarcerated pending disposition of this case regardless of whether he received an allowance for some or all that time against a sentence in another case." 320 Kan. at 311-12. We vacate the portion of the journal entry limiting the application of jail credit in this case and remand with instructions for the district court to prepare a nunc pro tunc journal entry reflecting Elam is entitled to jail credit for all days he was held pending disposition of this case, irrespective of whether Elam received credit for those days toward any other sentence. With this instruction, we remind the district court it is its duty to calculate all jail credit while in the courtroom on the record for inclusion in the journal entry and thus give the defendant an opportunity to accept the court's calculation or object. See *Talkington v. Schnurr*, 66 Kan. App. 2d 401, 408-09, 2026 WL 120131 (2026), *petition for rev. filed* February 13, 2026.

Conviction affirmed, sentence vacated in part, and case remanded with directions.